# LOIS SCHLOSS *v.* METROPOLITAN LIFE INSURANCE COMPANY.

[No. 11, October Term, 1939.]

192

*Decided November 29th, 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*Raphael Walter,* with whom were *David S. Sykes* and *Nyburg, Goldman & Walter* on the brief, for the appellant.

*Michael J. Manley,* with whom was *W. Hall Harris, Jr.,* on the brief, for the appellee.

MITCHELL, J., delivered the opinion of the Court.

On September 25th, 1936, the Metropolitan Life In-

surance Company issued a policy insuring the life of Rebecca Schloss, under the terms of which it promised to pay to Lois Schloss, daughter of the insured and beneficiary named therein, the sum of $2000, upon receipt of due proof of the death of the insured.

In accord with the provisions of section 87 of article 48A of the Public General Laws of Maryland, the policy provides as follows: "(4) Entire Contract: This policy and the application therefor, a copy of which is attached hereto as a part hereof, constitute the entire contract between the parties, and all statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties, and no statement shall avoid this Policy or be used in defense of a claim hereunder unless it be contained in the application therefor."

"Part A" of the application was executed by the insured on August 7th, 1936, and the medical examination pertaining thereto, and designated as "Part B," was made on August 25th, 1936, and signed by the applicant on said latter date.

The answers made by the applicant to Questions 17 and 18, in her application, in connection with her certification that they were correctly written as given by her and that they were "full, true and complete," give rise to the present controversy, and are therefore specially referred to herein.

Question 17, designed to elicit any knowledge on the part of the appplicant of some organic affliction, embraced an inquiry as to whether the applicant had ever had "cancer or other tumor." And Question 18 was as follows: "Have you been attended by a physician during the last five years? If yes, give name of complaints, dates, how long sick and names of physicians." To each of which interrogatories the applicant answered "No."

The insured died on July 30th, 1937, and the conceded facts are that all premiums on the policy to date of her death, in the aggregate amount of $108.08, had been paid to and received by the insurer; that no benefits under the policy had been paid; that the appellant was the

194

beneficiary named in the policy as of said date of death, and that due proof of the death of the insured had been filed with the insurer.

Upon the refusal of the insurer to pay the loss evidenced by the policy, suit was brought thereon. The declaration alleges the compliance with all the requirements of the policy in accordance with its terms and conditions, demand for payment of the loss and the refusal of the defendant to pay the same; issue being joined on the general issue pleas.

It appears from the record that, notwithstanding the negative answer, given by the insured in her application, to Question 18, she had consulted Dr. William Curtis Stiffler a short time prior to the date on which the answer was given and in this connection the doctor testified as follows: "Q. Did she consult you in or about the month of August, 1936? A. Yes, she did. Q. On what dates? A. On the 10th of August I saw her first. Q. And on the 10th of August in connection with what ailment did she consult you. A. Well, she consulted me about a pain in her left shoulder, and I have down here some notes, 'a little fullness along the border of the pectoralis muscle.' Q. Do you know what advice you gave her at that time? A. I gave her some iodine—I do not know what advice I gave her—for that little swelling, you know, as I took it to be an enlarged gland along the border of the muscle, and I gave her some iodine. * * * Q. When did she next consult you? A. August 15th. Q. And what was the nature of her complaint at that time? A. She had some tenderness, and on that day I put down that 'she has a little swelling of the left axillary glands.' Q. Did you prescribe for her at that time? A. I have not any prescription down here, no. Q. Do you remember what advice you gave her? A. Well, no, I could not because I did not make a note of it, but it was just the advice to rest it, you know, and use that iodine, but I do not know of any special advice I gave her. Q. You state you diagnosed the trouble as swelling of the axillary glands? A. Glands

along the border of the pectoralis muscle and axillary glands, yes. Q. Did you tell her what your diagnosis was? A. Well, if I told her anything it was that she had swollen glands. I did not just put down what advice I gave her."

Dr. Stiffler further testified that he again saw the insured on September 14th, at which time the complaint was the same, and he did not prescribe for the patient; that on September 19th, she consulted him about an irregularity in her menstruation, for which he did nothing, nor did he at that time examine her swollen glands. He added that he had told Mrs. Schloss to see a surgeon, and that she told him that she had consulted with Dr. Walter D. Wise on September 18th. The witness thereafter talked with Dr. Wise with reference to the latter's diagnosis of the case, and testified that the opinion of Dr. Wise coincided with his, in that Dr. Wise at that time "just considered it a case of enlarged glands."

He next saw the insured on November 9th, at which time her glands were a little larger and he advised an operation. She was operated on by Dr. Wise two days later in the presence of the witness, who then testified: "Q. And what was the diagnosis at the time of the operation? A. 'Probably carcinoma,' I put down here. It was positive after that examination of the specimen, you know, but at the operation I put down 'probably carcinoma.' * * * Q. What was Mrs. Schloss' previous medical history, as far as you know it prior to August 10th, 1936? A. It was uneventful. I do not know of anything special."

The concluding and cross-examination of Dr. Stiffler developed the fact that he was the attending physician of the insured for many years; that he did not consider the case of Mrs. Schloss susceptible of serious possibilities; that he advised her to consult Dr. Wise because the glands were getting larger and he thought they ought to be taken out; that he did not advise the insured that her condition was serious, nor down to the time of the operation did he consider it serious; that neither he nor

Dr. Wise knew of a cancerous trouble with which their patient was afflicted, until the operation showed its presence, but that it was his present opinion, based upon the facts which the operation disclosed, that the carcinoma was developing about the time of the first visit of the patient to his office in August, 1936.

The witness was finally asked the following questions and gave the following answers: "Q. And it is possible that the cancer developed subsequent to her visit to you, is that correct? A. It is possible, but I do not think it did. I think, as I said, that the thing was developing when she first came to see me, but it is so indefinite. Just as a matter of information, when she went to Dr. Wise in September, he said he did not think it amounted to anything, but he would take them out (referring to the axillary glands), because they were hurting her some. That is what he told me over the phone. It was just a matter of opinion. Q. Is it or is it not recognized by the medical profession that enlarged glands of this kind may be enlarged from a cause other than cancer and subsequently become cancerous? A. Why sure, that is what we thought it was, enlarged glands * * * her breast did not seem to be involved, and you do not look for enlarged cancerous glands in the axillary muscle unless there is evidence of involvement in the breast. * * * Q. So that, summarizing your statement * * * with respect to the probabilities of the existence of cancer in August, 1936, your opinion is that it probably existed, but that it is not absolutely certain that it did? A. Yes, that was our opinion of it."

Dr. Wise did not testify in the case, but by a certificate over his signature on a death proof form which appears in the record, he certifies that the immediate cause of the death of the insured was "carcinoma of the left breast"; that the period in which she suffered from that disease or impairment was "several months?"; that the contributory cause of death was "metastasis," the duration of which was "several months"; and that he was first consulted by the deceased on September 18th, 1936.

It is recited in the death proof filed by the claimant that the cause of death was "pneumonia and cancer"; and in the medical certificate of Dr. Stiffler, also filed in connection with the proof of the claim, that the immediate cause of death was "carcinoma—axillary glands," and that the duration of the disease or impairment was "about 1 year."

At the close of the testimony submitted by both plaintiff and defendant, the plaintiff offered three prayers, all of which were rejected by the trial court, and the defendant offered four. Of these, its A prayer was granted, its C prayer as amended by the court was also granted, and its D and B prayers rejected.

The single exception found in the record is based upon the court's ruling on the prayers, and, at the hearing before this court, the appellant abandoned all points raised by the exception, except as to the granting of the defendant's A prayer. That prayer instructed the jury that no legally sufficient evidence had been offered to entitle the plaintiff to recover more than the amount of the premiums paid, and that their verdict, therefore, must be for the plaintiff only for such sum.

From a judgment entered on a verdict for the plaintiff, in accordance with the above instruction, this appeal was taken. The inquiry submitted by this appeal, therefore, is whether the trial court was correct in ruling that the answers to Questions 17 and 18, by the insured as indicated, were false and material as matters of law.

In *Metropolitan Life Ins. Co. v. Jennings,* 130 Md. 622, 625, 101 A. 608, 609, it was stated: "This court has said a number of times that ordinarily it is the province of the jury to determine the falsity and materiality of the representations made in an application for an insurance policy, and the burden is upon the defendant to satisfy the jury of the truth of these defenses; but where the falsity and materiality of the representations are shown by clear, convincing, and uncontradicted evidence, the court may so rule as a matter of law." *Fidelity Mut. Life Assn. v. Ficklin,* 74 Md. 172, 173, 21 A. 680, 23 A.

197; *Dulany v. Fidelity & Cas. Co.,* 106 Md. 17, 66 A. 614; *Mutual Life Ins. Co. v. Rain,* 108 Md. 353, 70 A. 87; *Bankers' Life Ins. Co. v. Miller,* 100 Md. 1, 59 A. 116; *Maryland Casualty Co. v. Gehrmann,* 96 Md. 634, 54 A. 678; *Aetna Life Ins. Co. v. Millar,* 113 Md. 686, 78 A. 483; *Mutual Life Ins. Co. v. Mullan,* 107 Md. 457, 69 A. 385; *Forwood v. Prudential Ins. Co.,* 117 Md. 254, 259, 83 A. 169; *Commercial Casualty Ins. Co. v. Schmidt,* 166 Md. 562, 171 A. 725, 728. In the latter case it is said: "The question of materiality is not exactly whether disability of any sort is proved to have existed at the time of making the application, but whether the misrepresentation of the true facts would reasonably have affected the determination of the acceptability of the risk. * * * *Cooley, Briefs on Insurance,* 1965. Usually it is a question for the decision of a jury, but not always. Whenever in any case it is manifest from uncontradicted testimony or from the nature of the misrepresentations that they must have been material to the risk, the court is so to rule as a matter of law." In line with these authorities, in the case of *Sun Ins. Office v. Mallick,* 160 Md. 71, 153 A. 35, it is stated: "The materiality of a misrepresentation or concealment is generally a question of fact to be found by the jury. *Franklin Ins. Co. v. Coates,* 14 Md. 299; *Mutual Ins. Co. v. Deale,* 18 Md. 26; *Columbian Ins. Co. v. Lawrence,* 10 Pet. 507, 9 L. Ed. 512. There may be, however, cases where the falsity or materiality is established by such clear, convincing, and uncontradicted evidence that it becomes the province and duty of the court to so declare as a matter of law.". *Metropolitan Life Ins. Co. v. Samis,* 172 Md. 517, 192 A. 335.

In *Bankers' Life Ins. Co. v. Miller, supra,* the insured, who was suffering from cancer of the uterus and upon whom a surgical operation therefor had been performed, represented to a life insurance company that she was in good health and had never had cancer or uterine disease of any kind. The policy was issued and the woman died within six months thereafter. In an action against the

insurer it was held that the jury should have been instructed that these representations were material to the risk, and being untrue according to uncontradicted evidence, precluded a recovery on the policy, whether the insured knew that they were, or were not, untrue. This court, in disposing of the case, said: "The better authorities agree that a material misrepresentation made by an applicant for life insurance, in reliance on which a policy is issued to him, avoids the policy, whether it be made intentionally, or through mistake and in good faith. This doctrine rests upon the fact that, even if the untrue material representation be innocently made, it deceives the insurer, who relies upon it, and thus the risk which he actually assumes is different from the one which the action of the applicant in making the representation led him to suppose he was assuming."

Other incidents of gross misrepresentations knowingly made by applicants for insurance will be found in *Mutual Life Ins. Co. v. Mullan, supra,* where the applicant stated that he was temperate, had never been treated for intemperance, and the proof showed that he was addicted to the habit of drink and had been treated over a period of years for alcoholism; *Forwood v. Prudential Life Ins. Co., supra,* a case in which the applicant represented himself as being temperate, the proof showing that for years he had indulged in alcoholic beverages to excess; *Metropolitan Life Ins. Co. v. Jennings, supra,* wherein the applicant represented that he had never been an inmate of a sanatorium or hospital, the proof being definitely to the contrary; *Loving v. Mutual Life Ins. Co.,* 140 Md. 173, 117 A. 323, in which the applicant stated that he had never had any illness or disease, other than minor complaints; had been treated by but one physician within five years, and that he had never been under treatment in any hospital or sanatorium, when in fact he had pulmonary tuberculosis, had within five years been treated by two physicians, and for over a year been under treatment in a sanatorium for that disease.

As has been indicated, in all of the latter cited cases the ailments concealed were patent and serious; and especially, in the cases the facts of which we have just detailed, there is the presence on the part of the applicant of actual knowledge of the ailment and a fixed design to conceal.

On the other hand, numerous cases are found in the reports of this court in which is laid down the principle that an untrue statement made in an application for insurance does not void the policy unless such statement was not made in good faith by the applicant, or is related to some matter material to the risk. For example, in the case of *Ætna Life Ins. Co. v. Millar*, 113 Md. 686, 78 A. 483, 487, which was a suit on a health policy, the insured stated in his application, dated June 15th, 1908, that he had had no medical attention for two years. The uncontradicted evidence showed that he had consulted his family physician for ear trouble from May 17th to May 23rd, 1908, that he had consulted an ear specialist on May 21st, 1908, that the latter found him suffering from acute inflammation of the ear and advised him to permit an incision of the drum head to discharge the pus, and told him that, though he would suffer pain in the meantime, he would run the risk of serious complications, although it was probable that the drum head would rupture, in which event it would relieve the patient. The patient refused to submit to the puncturing, and about May 25th, was relieved by the rupture, whereby the pus was discharged. On June 30th, 1908, the insured had a return of the pain in his ear, and the next morning went to a hospital, where on July 2nd, 1908, he was operated upon for mastoiditis. In that case it was stated by this court: "It is said in 25 Cyc. 812, that 'answers as to diseases, injuries, or physical conditions are not rendered untruthful by failure to disclose temporary derangements, ailments, or injuries existing or preexisting which do not affect the general health and are not serious in their nature.' If, therefore, the ear trouble from which the plaintiff suffered prior to making the

application was, as he supposed, merely temporary, and had entirely passed away, leaving his general health unimpaired, then the answer complained of was not untruthful within the meaning of the law; if, on the other hand, that trouble was serious, and there was an infection which resulted in mastoiditis on the night of June 30th, 1908, that condition would avoid the policy, because the answer contained in the application would be both false and material to the risk. If such falsity and materiality had been shown by clear and convincing proof, it would have been the duty of the court to have directed a verdict for the defendant. Otherwise these questions should have been submitted to the determination of the jury."

In *Dulany v. Fidelity & Cas. Co.,* 106 Md. 17, 66 A. 614, the uncontradicted proof was to the effect that the applicant for an accident and health policy stated that he had received no medical attention for seven years prior to the application, and that statement, under the terms of the contract, was made a warranty. In an action on the policy, the evidence showed that the applicant had been treated during that period, and shortly prior to the date of the application, for throat trouble. The insured was injured in an accident and developed tuberculosis. It was there held that the failure on the part of the insured to make reference in his application to the medical treatment which he had received within the prohibited time prescribed by the application tended to prove that the ailment was trivial and unimportant, and that accordingly the misrepresentation did not avoid the policy.

Again, in the recent case of *Mutual Life Ins. Co. v. Held,* 157 Md. 551, 146 A. 755, the same principle was affirmed, the court holding that the fact that one whose life was insured had failed in his application for insurance to answer fully questions as to the ailments from which he had suffered, or as to which he had consulted a physician, did not constitute a defense to an action on the policy as a matter of law, there being evidence that

the ailments which he failed to mention were all minor and in no way related to the arterial condition which caused his death and of which he was ignorant; it being a question for the jury whether the omissions in his answers were material to the risk.

A careful examination of the last three cases to which reference has been made will reveal the fact that in all of them the answers to the respective questions bear no evidence of *mala fides* on the part of the applicants; and while we are not unmindful that the facts in the instant case are not analogous to the peculiar facts with respect to these cited cases, there is a similarity in that the evidence does not show that the applicant in the case before us was aware of any serious condition of health at the time of signing the application, as was also the fact in the other cases. Bearing in mind that the question of materiality is not whether disability of any sort is proved to have existed at the time of making application, but whether the misrepresentation of the true facts would reasonable have affected the determination of the acceptability of the risk, the question here presented is, what effect the disclosure of the omitted facts to Question 18 in the instant case would have had on the action of the insurer as to the issuance of the policy; for while the record shows that the applicant's decedent did consult two physicians between the date on which she signed the application and the date of the delivery of the policy to her, there is no evidence that at the time the questions were answered the insured had knowledge of the presence of any dangerous or organic disease in her system. It is true she had within the prohibited period consulted her regular physician, and upon the latter's advice she had also consulted a surgeon; but it is also true that her regular physician regarded whatever ailment she then had as but trivial, as is evidenced by the treatment he advised; and when upon his advice she consulted the surgeon, all he suggested was the removal of certain glands in the arm as a means of relieving pain therein. Neither of the physicians in any manner led the appli-

cant to even fear that she was afflicted with carcinoma or cancer, assuming but not concluding that at that time she was so afflicted. Furthermore, Dr. Wise, in his certificate of death, as to the duration of the cancerous trouble from which the applicant died, answers the question: "Several months," indicating that at the time he filled out the death proof he did not know how long the deceased had suffered from the malady; and Dr. Stiffler, with equal frankness, testified that down to the time at which the applicant was operated upon he had no such knowledge. In behalf of the insured, therefore, it may be stated that, when she answered Question 17, and on the date the policy was delivered to her, the evidence tends to show that she had received no intimation from either of her physicians that she was afflicted with the disease from which she died. It may also be observed that the form of Question 18 was more or less misleading, in that the words "attended by a physician" may have conveyed to the insured the impression that it did not contemplate visits by a patient to a physician's office, but was designed only to cover cases in which the patient, because of inherent illness or incapacity, was unable to visit a physician and consequently was "attended" in the sense of having been actually visited by a physician; it being evident from the record that the insured in the case before us visited the offices of both physicians on the respective occasions of her consultations with them. In *Prudential Ins. Co. of America v. Lear*, 31 App. D. C. 184, a distinction was drawn between "attendance" and "consultation," and it was held that the fact that the insured, in her application for a policy of life insurance, stated that she had not been "attended" by a physician except about two years before, while the evidence in the suit on the policy showed that she had "consulted" a physician during that period, will not defeat a recovery. 4 *Cooley's Briefs on Insurance* (2nd Ed.), p. 3389; 63 *A. L. R.* 846; *Prahm v. Prudential Ins. Co.*, 97 N. J. L. 206, 116 A. 798. And it may be added that, as a general principle, courts will construe the language of a policy

favorably to the insured, and will relieve the latter from responsibility for erroneous answers to questions in an application if they are in any wise ambiguous. *Richards on Insurance Law* (2nd Ed.), sec. 348. But aside from the doubt as to the meaning of the question answered by the insured, in view of the uncertainty of the testimony of the physician and the surgeon as to the time when the malignant growth developed, it cannot be held as an established fact that the cancerous condition of which the insured died actually existed when she signed the application or when the policy was issued. The uncertainty on this point leaves the fact to be found, under proper instructions, for the jury.

For the error in granting the appellee's A prayer, the judgment appealed from will be reversed and the case remanded for a new trial.

*Judgment reversed, with costs, and case remanded for a new trial.*