## BAKER *v.* CONTINENTAL CASUALTY COMPANY

[No. 79, October Term, 1952.]

*Decided February 6, 1953.*

The cause was argued before SOBELOFF, C. J., and COLLINS, HENDERSON and HAMMOND, JJ.

*Melvin J. Sykes* for the appellant.

*Roszel C. Thomsen,* with whom were *Clark, Thomsen & Smith* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

The appeal in this case is from the action in the Court of Common Pleas, setting aside a verdict of the jury in favor of the appellant, Norman W. Baker, the plaintiff below, and entering judgment, notwithstanding the verdict, in favor of the appellee, Continental Casualty Company, the defendant below.

The appellant is a young man who served three years as a Navy Aviation Cadet, and upon his return to civilian life, resumed his studies at Swarthmore College. Upon graduation from that institution in February, 1949, he became a full-fledged member of the American Society of Civil Engineers, having been a student member while in college. Shortly after his graduation, he was sent an application for enrollment in a group accident and health insurance plan of the American Society of Civil Engineers, which the Continental Casualty Company was underwriting. He filled out and mailed the application, which was accepted by the appellee without medical examination, and received a certificate of insurance which, among other things, provided sickness benefits of $50 per week for a maximum period of one year.

After his graduation and before, and at the time, he applied for his insurance, the appellant was employed as a civil engineer for a construction company. In the Spring of 1950, some six months after the effective date of the policy, the appellant first began to feel sick. He had a cold which he could not throw off. His ailment was diagnosed as tuberculosis late in 1950, and he was completely disabled from November 9, 1950 for more than a year. Proofs of claim, duly filed, were rejected by the appellee. There is no dispute that the basic damages recoverable, if the appellant is entitled to recover, amount to $2,600.00. Suit was filed in the Court of Common Pleas of Baltimore City in December, 1951 and after trial, a jury found a verdict for the plaintiff in the amount of $2,756.00—the agreed amount of $2,600.00, plus interest. The Court set aside the verdict and this appeal followed.

The appellee's defense at the trial of the case was based upon the application and the answers given therein. At first, two questions were relied upon. "Are you now to the best of your knowledge and belief in good health and free from any physical impairment or disease? (Give details of all exceptions)." This question was answered "Yes". The second question was, "Have you

ever had any injury, sickness or physical condition requiring a doctor's care or a surgical operation? If so, state nature, dates, and duration of disability." The answer to this question was, "Yes, tonsillectomy—1931". Any defense based on the first question and answer has been abandoned by the appellee, and it now relies solely on the answer to the second question. The appellee argued below and in this Court that it was entitled to judgment *n.o.v.* for one reason, "because it appears from the undisputed evidence offered by the plaintiff that he had had a 'physical condition requiring a doctor's care' for several years before he signed the application, and his representation of the contrary in his application was material to the risk, in that the insurance would not have been written if he had disclosed that he was under a doctor's care for a tubercular spot on his lung."

The Court, in its final charge to the jury, told them that as a matter of law, the answer to the question involved was material to the risk and if the representation in the answer was found by the jury to be untrue, this would be a material misrepresentation, entitling the defendant to prevail. The Court further instructed the jury that the answer to the second question, "Yes—tonsillectomy, 1931", was equivalent to saying that Baker had had nothing other than that minor operation, the equivalent being, No, that he had had no injury, sickness or physical condition requiring a doctor's care . . . so that it is up to you, members of the jury, to determine whether the answer to that question was truthful or whether it was a misrepresentation of the actual conditions.

We consider it unnecessary to pass on the Court's instructions to the jury on the question of materiality and the effect of Baker's answer to the second question since, as did the jury, we find for the appellant, and the instructions given were as unfavorable to him as could be expected. We think that the decisive question in the case is whether, in the light of Baker's history, his answer was untrue and a misrepresentation, as a matter

of law, or whether the jury should be permitted to decide its truthfulness or untruthfulness.

At Swarthmore in the fall of 1946, after his return from his tour of duty in the armed services, Baker had a routine chest x-ray taken by a mobile unit. The film used was "an unsatisfactory type of film" and Baker was referred to the Henry Phipps Institute of Philadelphia for a better picture. The second x-ray was taken by Baker to his family physician in Reisterstown, who referred him to Dr. Walton, an x-ray specialist in Baltimore. In turn, Dr. Walton sent Baker to Dr. H. Vernon Langeluttig, a specialist in internal medicine and diseases of the chest, and Chief of the Tuberculosis Division of the Baltimore City Hospital and consultant to the Veterans' Administration. Baker was continuing his studies at Swarthmore and did not see Dr. Langeluttig until the Spring of 1947, when the doctor then examined the previous x-rays and took his own. He said that the x-rays disclosed "what had been diagnosed by Dr. Walton, Dr. Kilby, and myself, as a very minimal infiltration in the second interspace on the right . . . in popular parlance that is what is called a spot . . . it was of a very minimal nature and could easily have been overlooked because of its minimal extent." The doctor testified that it is absolutely impossible to make a positive diagnosis of tuberculosis from an x-ray film showing such a spot. It is necessary to obtain "positive bacteriological proof. That is, we must find a tuberculosis bacillus in the patient's sputum or in the patient's gastric contents". These tests were made on Baker in 1947, 1948 and 1949, and consistently showed no tuberculosis. In answer to a question as to what he advised his patient, Dr. Langeluttig said, "I advised Norman that he had a spot on his lung which was suspicious but it was not conclusive of active disease, and that he should be re-x-rayed at periodic intervals as a safety precaution." He was asked whether he prescribed any treatment of any kind for Baker, and replied: "There was no treatment to prescribe." The doctor further testified

that "a spot on the lung doesn't necessarily represent active disease. Approximately 50 per cent of the population, of the people sitting in this room, have spots on their lungs which may show up by x-ray. That has been proved medically time and time again, but that does not mean we have active infection or disease in our lungs. So that, in order to determine whether or not the spot is active you have to follow a patient by obtaining several x-rays, . . . we perform routine periodic examinations of the sputum and the gastric washings on the patient to see if we can find the causative organism." On October 30, 1947, the doctor wrote the appellant's mother that the x-ray just taken "has shown no progression . . . and I certainly feel that this process represents a healing. I feel, however, that Norman should have his chest x-rayed again, probably at the end of the current school term in June, though I see no cause for alarm." In July, 1948 the doctor wrote to the appellant himself, saying that there was no change, and adding that "If I were you, however, I would check this at least once every six months."

The evidence of the appellant himself was that he saw Dr. Langeluttig every six months from early 1947 to July, 1949. Each time the doctor found the condition inactive, prescribed nothing and indicated no manner of treatment. During all of this period, and at the time of his application, the appellant was employed by the Turner Construction Company of Philadelphia. He "used a transit, a level in laying out the building, shooting grades and elevations, putting lines on footings, laying out of the building itself, and the partitions, and in general acting as a superintendent's helper in supervising and seeing that the sub-contractors performed their work in accordance with the plans and specifications." During this entire period, he felt "perfectly fine", both off and on the job. His wife testified that she and the appellant were married in July, 1948, and between that time and July, 1949, when he applied for the policy, he never complained of any illness of any

kind. The appellant himself, asked why he answered the question concerned in this case as he did, said: "Well, in the first place I didn't have any injury, I didn't have any sickness, and the surgical operation is listed. Now, then, the 'physical condition requiring a doctor's care', I had been to see the doctor. He had made all these tests and he could find nothing wrong.' As a matter of fact, I was only seeing him once every six months. It never even entered my mind when I was answering this question to think of an x-ray as being a doctor's care or treatment. I never even gave it a thought." Finally, a juror asked Dr. Langeluttig "whether there is any difference between being examined by a doctor and being treated by a doctor. . . Is there any difference between being under the care of a doctor and being examined by a doctor?" The doctor replied: "Very definitely so. The medical profession is advocating that everybody be examined periodically by a doctor, whether they are under the care of a doctor, because they have no specific disease which requires treatment. We are having campaigns all over the country, for diabetic detection, tuberculosis detection, and various other diseases, rheumatic heart disease, and so forth, advocating that people be examined by the doctors; but that does not imply treatment in any sense of the word."

We think the juror's question went to the heart of the case. Examination, treatment and care by a doctor are different, but in certain instances, they may overlap. The appellee concedes that everything that happened to Baker, or that he did up to the time he went to see Dr. Langeluttig, could perhaps be called "examination", that is, his x-ray at college, his checkup at the Philadelphia institution, his consultation with his family physician and with Dr. Walton. The appellee, to show that Baker was under "care" thereafter, relies very heavily on two questions asked Dr. Langeluttig in cross-examination:

"Q. So that would be about April 7, 1947 when you first saw him?

A. That is proper.

Q. And he has been under your care since that time?

A. That is correct."

The juror's question followed immediately and it is evident from the doctor's answer to the juror, as well as from his testimony as a whole, that his answer to a question containing the word "care" cannot be given the weight or significance that the appellee gives to it, and that the doctor did not so intend it.

We think that the appellant's argument that what he received at the hands of Dr. Langeluttig was "examination" and not "care", is plausible, if not convincing, and that, in any event, the question is one for the jury to pass upon. Certainly a reasonable man could take the view that periodic precautionary check-ups every six months at which no medication was given, no treatment prescribed, and no advice given save a precatory admonition that it would be well to return in six months, contained no elements of care and were solely examinations. The average man might consider what Baker did as the substantial equivalent of the normal visit every six months for a check-up by a dentist. If the jury thought as it did, that what he received was "examination" and not "care", Baker's answer to the question involved was true and there was no misrepresentation. A representation, to avoid a policy, must not only be material to the risk but also false or untrue.

In *Aetna Life Ins. Co. v. Millar*, 113 Md. 686, 78 A. 483, the Court laid down the rule which has been reiterated before and since, that whether a representation is true or false, or material to the risk, is ordinarily and generally for the jury to determine. The matter went to the jury in that case on the question of the plaintiff's good faith in making the statements, their truth or falsity, and their materiality. The Court said: "It is ordinarily the province of the jury to determine the falsity and the materiality of the misrepresentation, and the burden is upon the defendant to satisfy the jury of the truth of these defenses." The Court recognized the

rule that whenever bad faith or falsity or materiality is shown by uncontradicted or clear and convicing evidence, the matter may be one of law. If there is a conflict in the evidence, or the evidence is doubtful, the question is one for the jury. In the *Millar* case, there was involved a mastoiditis which developed shortly after the issuance of the policy. The plaintiff had not been informed that he had this trouble, although he had suffered painfully with his ear and he did not regard it as a serious thing. The Court said: "If, therefore, the ear trouble from which the plaintiff suffered prior to making the application, was as he supposed, merely temporary, and had entirely passed away, leaving his general health unimpaired, then the answer complained of was not untruthful within the meaning of the law; if, on the other hand, that trouble was serious and there was an infection which resulted in Mastoiditis . . ., that condition would avoid the policy, because the answer contained in the application would be both false and material to the risk." *Richards*, on *Insurance Law*, 3rd Edition, Sec. 109, page 146, in discussing the difference between a representation and a warranty, (the Maryland Statute, Art. 48A, Sec. 171, equates the two and makes the quotation pertinent) says: "This distinction is better defined in the statement that, if the decisive issue on trial involve an inquiry either as to the substantial truth or as to the materiality of a representation, the right to determine the case is apt to be taken from the Court and carried over to the jury." Other cases in which the jury was permitted to pass on the truthfulness of a material representation, include *Mutual Life Ins. Co. v. Rain*, 108 Md. 353, 70 A. 87, and *Dulany v. Fidelity & Casualty Co.*, 106 Md. 17, at 38, 66 A. 614. In *Mutual Life Ins. Co. v. Held*, 157 Md. 551, 146 A. 755, the Court distinguished cases where the Court had ruled as a matter of law that the answers to questions were false and material to the risk, including *Bankers Life Ins. Co. v. Miller*, 100 Md. 1, 59 A. 116, in which the insured failed to state that she had been operated upon in a hospital

for a malignant growth; *Mutual Life Ins. Co. v. Mullan,* 107 Md. 457, 69 A. 385, "where the applicant stated that he was temperate and had never been treated for alcoholism, the proof being that he was a common drunkard who had been treated for years for alcoholism"; *Metropolitan Life Ins. Co. v. Jennings,* 130 Md. 622, 101 A. 608, "wherein the applicant said he had never been in a hospital or sanatorium, though for nearly two years before his application he had rarely been anywhere else"; and *Loving v. Mutual Life Ins. Co.,* 140 Md. 173, 117 A. 323, which was a tubercular case. The Court then said, in the *Held* case: "In all of these cases the ailments concealed were patent, serious, and organic, whereas in the instant case the insured did not know he had arterio sclerosis, which had not affected his general health, and failed to mention consultations for ailments which in themselves were not serious and which, it was testified, were not related in any way to his arterial condition. In the opinions of this court in all of the cases mentioned, it was declared that ordinarily it is the province of the jury to determine the falsity and materiality of the representations made in the application for insurance, with the burden on the defendant, but where the falsity and materiality of the representations are shown by clear, convincing, and uncontradicted evidence, it may be a question of law for the court." See also *Mutual Life Ins. Co. v. Robinson,* 115 Md. 408, 80 A. 1085.

In *Mutual Benefit Life Ins. Co. v. Wise,* 34 Md. 582, the question asked the insured was whether he had ever been or was now employed in any military or naval service. He answered "No." He had been a chaplain in the Army. There was no evidence to the effect that a chaplain is considered "in military service" or that he is employed, and the Court held the question to be one for the jury.

In *Schloss v. Metropolitan Life Ins. Co.,* 177 Md. 191, 9 A. 2d 244, the Court reviewed most of the cases on the question at issue, and held that "a material misrepresentation made by an applicant for life insurance,

in reliance on which a policy is issued to him, avoids the policy, whether it be made intentionally, or through mistake and in good faith." This is also specifically held and applied in *Silberstein v. Mass. Mut. Life Ins. Co.*, 189 Md. 182, 55 A. 2d 334. This statement of the law in both of these cases is based on the premise that the statement involved is untrue and is, therefore, a misrepresentation. The Court held in the *Schloss* case that the fact that the insured answered "no" to questions of whether she had cancer or other tumor, and whether she had been tended by a physician within 5 years, while as a matter of fact, she died of cancer less than a year after the policy was issued and had consulted physicians within the time named, was not as a matter of law material to the risk so as to defeat recovery or to take the case from the jury. The Court pointed out that some cases have drawn a distinction between "attendance" and "consultation", referring to one in which the insured had stated that she had not been "attended" by a physician except about two years before, while the evidence showed that she had "consulted" a physician during that period, and in which it was held that recovery was not precluded.

We hold, in the instant case, that it was for the jury to determine the truth or falsity of the appellant's answer to the question whether he had "a physical condition requiring a doctor's care". We find no error in the Court's charge to the jury generally, and because under those instructions, it has properly been permitted to pass on the case, we will reinstate its verdict and enter judgment for the appellant.

> *Judgment reversed, and judgment, with Costs, entered for the appellant against the appellee for $2,756.00.*