## HEIDENREICH *v.* METROPOLITAN LIFE INSURANCE COMPANY

[No. 150, October Term, 1956.]

*Decided May 9, 1957.*

*Motion for clarification filed and opinion modified, June 7, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*H. Robert Venables,* with whom were *W. Byron Sorrell* and *West & Venables* on the brief, for the appellant.

*Ralph W. Powers,* with whom was *John M. Lynham* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

This appeal involves the liability of the defendant, appellee, the Metropolitan Life Insurance Company, on a life insurance policy.

William C. Heidenreich signed an application on August 20, 1953, and on September 1, 1953, purchased from the defendant a mortgage term insurance policy insuring his life and naming the plaintiff, appellant, Audrey L. Heidenreich, as beneficiary. The principal amount payable under the policy decreased from year to year in proportion to the balance due on the mortgage debt against the Heidenreichs' home. The insured died on October 15, 1954, during the second policy year, and under the schedule of payments contained in the policy the sum of $9,600.00 was payable. The plaintiff claims that amount. All premiums on the policy were paid. The defendant refused to pay the $9,600.00 demanded and has tendered only the amount of the premiums paid under the policy because it contends that the insured in his application for the policy made false statements in bad faith regarding his health and prior medical attention, and also that these statements materially affected the risk, which it assumed when it issued that policy.

The plaintiff entered suit on the policy. The case was submitted to the jury and a verdict returned for the plaintiff for the amount of the policy. A motion for a judgment N.O.V. was filed by the defendant, which motion was granted by the trial judge and a judgment entered for the plaintiff for the sum of $148.40, the amount of the premiums paid. From that judgment plaintiff appeals.

Of course, in deciding whether to take a case from the jury as a matter of law, the trial judge should resolve all conflicts in the evidence in favor of the plaintiff and should assume the truth of all evidence and such inferences as may naturally and legitimately be deduced therefrom which tend to support the plaintiff's right to recover. If there is any evidence from which a rational conclusion may be drawn as opposed to the motion to take the case from the jury, that motion should not be granted. The weight of the evidence is for the consideration of the jury. *Martin G. Imbach, Inc. v. Tate,* 203 Md. 348, 356, 100 A. 2d 808.

In the deceased's application for the insurance policy he made the following statements, among others. An appendectomy was performed at Sibley Hospital in 1944. He was in good health when the application was made. He had never been treated for or sought advice concerning any ailment or disease of the stomach or intestines. He had never been treated for or sought advice concerning ulcers. He had never been in a hospital for observation, examination or treatment. He had never had a surgical operation except for the appendectomy in 1944 and the removal of a cartilage from his left knee in 1945. He had never been advised to modify or restrict his eating, drinking or living habits because of health conditions. He had never had an electrocardiogram or X-ray examination, or any laboratory examinations or tests. He had not consulted any physician, healer, or other practitioner within the past five years for any reason not mentioned therein.

To the contrary, Dr. Henry G. Hadley, who had been practicing medicine for thirty years in the general field of internal medicine, testified by deposition, taken in behalf of the defendant, that he first saw the deceased on May 18, 1950,

and took an X-ray and found a duodenal ulcer. On May 22, 1950, he took a gall bladder X-ray; on July 10th of that year he made a gastroscopic examination and found the ulcer; on July 11th he made a gastroanalysis; and X-rayed his stomach on December 25, 1950. The deceased was put on a diet and medicine was given him. He is sure that he informed the deceased of what was found, although he had no proof of it. There was no reason why he should not have informed the patient. By so doing he gets better cooperation. In 1950 the deceased came to see him twenty-seven times from May 18th to December 31st. In 1951 he came to see him six times between January 3rd and March 5th. He did not see him again until 1954 when he came on March 9, 11, 14, 16, 18, 22, 26 and 29 and on April 1, 4 and 8. He thought these visits averaged an hour each. He did not see him again or hear from him until the night he died, October 15, 1954. He had no record that he knew anything about the deceased using alcohol, and does not know whether he asked him to modify his drinking or living habits, although that is his custom. He was called to see the deceased on the date of his death between 10:30 P. M. and midnight and arrived twenty minutes later. At that time deceased had a cold clammy sweat, was in a state of shock, had very little pulse, was pale and had difficulty in breathing. About five minutes later he ceased to breathe and died. From the other symptoms he observed he believed the deceased had a coronary attack and died of that. He remembered that he had treated the deceased and had seen him, but his records were locked up that night. Because he had cardiac symptoms and a cardiac death, he filled out the death certificate as having treated him for that, while as a matter of fact he had never treated him for cardiac disease, but only for digestive disturbances. He was not positive as to the cause of death but to the best of his opinion it was from the cardiac disease. He did not attribute deceased's death to anything due to his ulcer because of the abrupt onset and suddenness of the death. If he had died of a perforation or hemorrhage related to the ulcer he would not have died so rapidly. There was no evidence of bleeding. He thought at the time of his death that he had some pulmonary symptoms

which led him to believe that it was a cardiac death rather than anything attributable to ulcers. He could have had a cerebral hemorrhage but there were no symptoms of that. It could have been due to a ruptured aneurysm. He was not influenced in his opinion that the deceased had a cardiac death because he thought he had been treating him for cardiac disease. When he went to the home he did not know what he had been treating the deceased for. Even if he had remembered that he had treated him for ulcers he would not have accounted for the death due to ulcers. He would still have considered that it was a cardiac death. On cross examination he testified that when the deceased originally came to him he tested his heart and blood pressure and found him to be in good general health except for the ulcer which was a nonsurgical thing. That type of ulcer is usually caused from an acid condition of the stomach. Ulcers very commonly heal readily under proper care and diet. He prescribed three kinds of internal medicine. He repeated that he did not believe there was any connection between the ulcer and cause of death. When asked whether ulcers of that type would affect the deceased's mortality and his normal life span, he replied that he had had patients on rare occasions die of hemorrhage, and sometimes, also on rare occasions, when operated on die as a result of the operation. He did not believe that he had had any patient die of the ulcer itself or knew that the ulcer necessarily shortened any patient's life. In his opinion the ulcer which the deceased had did not affect his normal span of life. When he took the initial X-ray examination of the deceased's stomach he made the diagnosis as being a duodenal ulcer. When he made the X-ray examination of the stomach on December 25, 1950, he did not see anything. As of that date the ulcer, which had previously showed on the X-ray, did not then show.

Dr. Robert J. Bosworth testified by deposition, taken on behalf of the defendant, that the deceased came to see him first on July 27, 1943, and his last office visit was on April 21, 1952. The patient visited him nine times in 1943 and fourteen times in 1944. The next visit was on June 10, 1946. He saw him again in 1949 on January 6th, October 20th, and

November 17th. He did not see him again until January 18, 1952, and in that year he saw him ten times before April 21, 1952. He saw him first on account of weakness, loss of appetite and loss of strength. He did not digest his food very well and certain foods gave him digestive distress. Not until November, 1944, was it suspected that he had an ulcer. On November 13, 1944, he was sent to Sibley Hospital for a diagnostic study. While there X-ray studies were made of his gall bladder and intestinal system. It was found that "he had a non-obstructing duodenal ulcer, number two, spastic colon, number three, para-appendiceal adhesions". As a result the appendectomy was done on November 17, 1944. After that he improved and his visits were for routine checkups and adjustment of medicine from time to time. He then got worse. On March 31, 1952, he was returned to Sibley Hospital for repeated X-rays and study of his gall bladder and upper gastro-intestinal system and he stayed there until April 5, 1952. His second study was totally normal except for the existence of a non-obstructing duodenal ulcer with striking deformity of the cap. The deceased was informed of that diagnosis. He prescribed diet and medicine and a request for a change in habits in relation to beer and tobacco. On cross examination he stated that he had no record of the deceased having any heart condition. His confinement at Sibley Hospital was to study his condition. No restriction was put on his physical activities. The ulcer was not a perforated one. It might have been possible to cure the ulcer by diet and restrictive use of tobacco and alcohol. When asked whether ulcers necessarily shorten a person's normal life span, he replied that in his experience people, when informed that they have an ulcer, get slightly neurotic, "prissy" and careful which might be in their favor as far as longevity is concerned. From his examination he had no reason to believe that deceased had any heart disturbances. Death from a perforated ulcer usually takes days or even weeks. He had never seen one occur within a space of hours. He believed the deceased fully accepted his diagnosis of a duodenal ulcer. As far as he could determine the deceased paid very little attention to the instructions given him with respect to

smoking, drinking beer, and eating certain kinds of food which he asked him to keep away from. By diet and restriction of tobacco and alcohol many ulcers have disappeared.

The plaintiff testified that the night her husband died he had eaten his supper and played a card game with her and their minor daughter. After the game was over and while sitting on a sofa he complained of having pain and that it was going down his arm. The pain then completely left him and he took a shower. The plaintiff heard a thud and found him unconscious. She called for doctors and Dr. Hadley came twenty minutes later and thirty minutes after the illness had occurred. As far as she knew her husband was physically well except for a stomach condition. He lost little time from work. He was told to cut down on smoking, which he did. She never knew of him having pains in his chest or arms before. The week before he died he painted their large house on the outside. She did not know he had an ulcer.

At the close of plaintiff's case the defendant moved for a directed verdict in its favor. This motion was overruled and the defendant then called Dr. Raymond K. Farnham, Assistant Medical Director of defendant company. He stated that he had heard the depositions of Dr. Hadley and Dr. Bosworth read. When asked whether or not his company would have refused to issue the policy if it had known that the deceased had made thirty odd visits to one doctor and several visits to another doctor, both of whom diagnosed the patient's ailment as a duodenal ulcer; and that the patient had stayed in the hospital five days for observation in connection with that ulcer, he replied, over the objection of the plaintiff, that the application would have been rejected. When asked whether such an ulcer in a man of the deceased's age, diagnosed in 1944 or 1945, and which persisted at least until 1952 would be a minor or serious ailment, he answered that it would be more than minor and would border on a major disability. Complications from such an ulcer can either lead to or hasten a person's death. After hearing the depositions and testimony, in his opinion it was not conclusive that the deceased suffered a coronary death. It did not appear to him that the deceased had a coronary disease but more likely

something that complicated the ulcer. When asked on cross examination whether a layman should be able to rely on a doctor, when the doctor advised him that he had no ulcers showing in the X-ray, he replied that "he should".

Dr. James L. Boyd, Deputy Medical Examiner for Prince George's County, and employed by the defendant to testify, stated that he had heard the testimony and depositions and under the circumstances, in the absence of an autopsy, he could not agree that the cause of death was a coronary embolism. He did not agree that such cause was conclusive. It was just as probable, and just as likely, that the man could have had a hemorrhage from the ulcer and died as a result of the hemorrhage.

The policy in this case provides in part: "All statements made by the Insured shall, in the absence of fraud, be deemed representations and not warranties." By Code, 1951, Article 48A, Section 171, whenever the application for a policy of life insurance contains a clause of warranty of truth of the answers therein contained, no misrepresentation or untrue statement in such application, made in good faith by the applicant, shall affect a forfeiture or be a ground of defense in any suit brought upon any policy of insurance issued upon the faith of such application, "unless such misrepresentation or untrue statement relates to some matter material to the risk." By Chapter 20, Acts of 1956, effective June 1, 1956, Cumulative Supplement, 1956, Article 48A, Section 171, the former section was repealed and reenacted and contained, among others, the following provision that all statements in such applications for life insurance or annuity shall, in the absence of fraud, be deemed representations and not warranties. "The falsity of any such statement shall not bar the right to recovery under the contract unless such false statement was either made with the actual intent to deceive, or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer."

In *Monumental Ins. Co. v. Taylor*, 212 Md. 202, 210, 129 A. 2d 103, filed February 12, 1957, the recent cases of *Hancock Mutual Life Ins. Co. v. Adams*, 205 Md. 213, 107 A.

2d 111, *Baker v. Continental Cas. Co.*, 201 Md. 464, 94 A. 2d 454, and other pertinent cases were carefully reviewed by Judge Prescott, and the following rule taken *verbatim* from the *Adams* case was said to be controlling "Ordinarily and generally, whether a representation is true or false, or material to the risk, is for the jury to determine, and the burden is on the defendant to establish such defenses. Where, however, bad faith or falsity or materiality is shown by uncontradicted or clear and convincing evidence the question may be one of law. If there is a conflict in the evidence, or the evidence is doubtful, the question is one for the jury."

In *Hancock Mutual Life Ins. Co. v. Adams, supra,* the applicant, who later died of heart failure and uremia, in his application for life insurance, dated May 19, 1951, was asked whether he had ever had pain in his chest or shortness of breath, whether he had ever had an electrocardiogram examination, and whether within five years he had consulted a physician with regard to these matters. To these questions he answered: "No." In fact, the insured had had pains in his chest in February and October, 1949, had consulted a physician on both occasions and on one of these occasions an electrocardiogram was taken. He had also consulted doctors on numerous occasions about various ailments within five years previous to his application and these consultations were not disclosed in his application. The opinion in that case pointed out that the testimony of the physicians whom he had consulted during the five-year period indicated that most of the applicant's ailments were not of a serious nature and failure to disclose consultations with physicians for minor ailments would not avoid the policy of insurance. The electrocardiogram was negative and the doctor whom the insured had consulted did not think he had heart trouble. The insured's first known heart attack occurred after the application. Chief Judge Brune reviewed the Maryland cases and stated the rule above quoted and which was taken almost *verbatim* from the *Baker* case. The Court there held that there was serious conflict in the testimony which brought the case clearly within that class where truth and material should be submitted to the jury. In *Baker v. Continental Cas. Co.,*

*supra,* Judge Hammond reviewed the Maryland cases. There the applicant for insurance answered the question: "Have you ever had any injury, sickness or physical condition requiring a doctor's care or a surgical operation? If so, state nature, dates, and duration of disability." The answer to that question was: "Yes, tonsillectomy—1931." The question was asked the doctor whether there was any difference between being under the care of a doctor and being examined by a doctor, to which he answered: "Very definitely so." The insurance company there contended that because it appeared from the undisputed evidence offered by Baker that he had had a physical condition requiring a doctor's care for several years before he signed the application his misrepresentation to the contrary was material to the risk in that the insurance would not have been written if he had disclosed that he was under a doctor's care for a tubercular spot on his lung. This Court, after setting out the evidence in detail, concluded that appellant's argument that what he received at the hands of the doctor was "examination" and not care, was plausible, if not convincing, and that in any event the question was one for the jury to pass upon. This Court reviewed most of the cases on the question at issue in *Schloss v. Metropolitan Life Ins. Co.,* 177 Md. 191, 199, 9 A. 2d 244, and held "a material misrepresentation made by an applicant for life insurance, in reliance on which a policy is issued to him, avoids the policy, whether it be made intentionally, or through mistake and in good faith." In the *Taylor, Adams* and *Baker* cases, *supra,* as in the instant one, the insurance contracts were executed before the effective date of Chapter 20, Acts of 1956, *supra.* Bad faith in applications for insurance is not a technical term used only in actions of deceit. It is an ordinary expression, the meaning of which is not doubtful. It means with actual intent to mislead or deceive another. *Penn Mut. Life Ins. Co. v. Mechanics' Savings Bank & Trust Co.* (C. C. A. 6th), 73 F. 653, 654; *Pac. Mut. Life Ins. Co. of Cal. v. Tetirick,* 180 Okl. 307, 68 P. 2d 828, 833; *N. Y. Life Ins. Co. v. Carroll,* 154 Okl. 244, 7 P. 2d 440. Bad faith and fraud are synonymous. *Words and Phrases,* Permanent Ed., Vol. 5, pgs. 11, 12, 13, 14; *Mayor & City Council*

*v. Ault,* 126 Md. 402, 429, 94 A. 1044; *Distilleries v. Machine Works,* 174 Md. 12, 197 A. 599.

From the above authorities it appears that the representations must be intentionally false and unless the insured knows or has reason to believe that the ailments as to which he makes misstatements are material to the risk, it is difficult to say *as a matter of law* that the misstatements are made in bad faith. An ailment is material if it is such as to be likely to shorten the life or likely to make an insurer unwilling to accept the risk. It is evident that the deceased made many incorrect statements in his application for insurance. However, Dr. Hadley, a witness for the defendant, stated that the X-ray examination on December 25, 1950, did not show the ulcer. Dr. Hadley also was of the opinion that the ulcer did not in any way affect the life span of the deceased and that death was not in any way attributable to the ulcer. Dr. Bosworth, a witness for the defendant, was of the opinion that an ulcer of that type does not shorten the life span and, in fact, might increase longevity, and that death from a perforated ulcer takes days and even weeks. The death here was without doubt very sudden. As to Dr. Farnham's statement that the application would have been rejected had the defendant known that the deceased had formerly had an ulcer, the mere pronouncement by the defendant after death had occurred that the policy would not have been accepted does not definitely settle the matter. 29 *Am. Jur., Insurance,* Sec. 525; *Volunteer State Life Ins. Co. v. Richardson,* 146 Tenn. 589, 244 S. W. 44; 26 A. L. R. 1270.

It might well be that if the weight of the evidence was before us as triers of fact we would find a verdict for the defendant. We cannot say, however, in this case as a matter of law in view of the contradictory statements of defendant's own witness that the misstatements were material to the risk and to the acceptance of the policy. Nor can we say that bad faith is shown by such uncontradicted, clear and convincing evidence as to be a question of law. Some of the doctors, defendant's own witnesses, were of the opinion that the former ailments, all of which related primarily to the ulcer, were not of a serious character. We are of opinion

298

that the learned trial judge should not have granted the motion N.O.V.

> *Judgment stricken out, and judgment entered for the appellant for $9,600.00, with interest from the date of the verdict of the jury, with costs.*