**UNION TRUST COMPANY OF MARYLAND, a body corporate, Trustee of the Trust Estate of Raymond Kent Tongue, Jr., deceased,**

v.

**KANSAS CITY LIFE INSURANCE COMPANY, a body corporate.**

Civ. A. No. 11959.

United States District Court
D. Maryland.
July 31, 1961.

City for the commuted value of a policy issued by defendant on October 2, 1957 on the life of Tongue. The case was removed to this court, where it was tried to a jury. At the close of all the evidence, defendant filed a motion for a directed verdict, on which the court reserved decision (F.R.Civ.P. 50(b), 28 U.S.C.A.), although expressing a strong tentative reaction that the motion was meritorious. The jury found for the plaintiff in the amount claimed. Defendant promptly filed a motion for judgment n. o. v. or in the alternative for a new trial, on which oral argument was heard.[2]

### Defendant's Contentions.

■ Defendant contends (1) that at the time of the acceptance of the application of Tongue, and at the time of the delivery of the policy to him, he was not in good health, in violation of a condition precedent to validity incorporated in the application and the policy; and (2) that Tongue made false statements in the application which "materially affected either the acceptance of the risk or the hazard assumed by the insurer." Maryland Code of Public General Laws, 1957 Edition, Article 48A, section 173.

William H. Zimmerman and W. Frank Every, Baltimore, Md., for plaintiff.

Forrest F. Bramble, Jr., and William B. Kempton, Barton, Wilmer, Bramble & Penniman, Baltimore, Md., for defendant.

R. DORSEY WATKINS, District Judge.

Plaintiff, as Trustee of the Trust Estate of Raymond Kent Tongue, Jr.,[1] deceased, brought suit against the defendant in the Superior Court of Baltimore

### Facts.

Most of the evidence is uncontradicted. Insofar as any conflict exists, it is herein resolved in plaintiff's favor. Chronology is significant, and in general is followed.

On July 18, 1957, after consultation with his attorney and a trust officer of plaintiff, Tongue executed a trust agreement to cover the proceeds of his five then outstanding life policies. He was advised that in view of his asset-liability position, and the prospective purchase of a small office building, he should increase his insurance coverage.

1. Raymond Kent Tongue, Jr. at the time of his death was a very successful and highly- regarded orthodontist. During the testimony he was often referred to as "Doctor" Tongue because this might carry the implication that he was a medical doctor, which in turn might be significant in connection with the problems in this case, he will for convenience and brevity be referred to hereafter as "Tongue."

2. Counsel had filed able, and exhaustive, memoranda before the trial began.

On July 25, 1957, Tongue, pursuant to an arrangement made by him, consulted Dr. William Garis, the Tongue "family physician", but whose specialty was cardiology. Tongue complained that during the past month he had had half a dozen instances of tightness across the chest; he experienced difficulty in breathing when playing the first one or two holes of golf, particularly if he played just after lunch, but that he did not have to stop; the sensation wore off by the third hole. Tongue asked for an E K G (electrocardiogram) and a "heart check." Dr. Garis testified that his "obvious impression" was that these complaints were suggestive of heart involvement; of angina pectoris.

Dr. Garis gave Tongue a general physical examination, including fluoroscopy, with essentially negative results. The resting E K G was also within normal limits. Dr. Garis then took a "double Masters" [3] E K G, in certain portions of which he noted what he interpreted as distinct changes in certain of the waves "favoring cardiac insufficiency"; abnormality or disease. He further testified that the readings were suggestive of an involvement of the anterior (front) heart muscles. The readings were "on the border line of definite coronary insufficiency." As a result of the history and examination, Dr. Garis without question "leaned toward the probability of heart disease"; it was his "impression" that Tongue had coronary artery sclerosis. This was not sufficient for an "absolute diagnosis", but it was his "working diagnosis." [4]

Dr. Garis wished for a further check, and had Tongue make an appointment with Dr. Frank W. Davis, Jr., for a "ballisto" cardiogram.[5] This was taken on August 2, 1957, and a written report and copy of the tracing were sent by Dr. Davis to Dr. Garis. On August 7, 1957, Dr. Garis reviewed the problem with Tongue, telling him that the combination of his history and the E K G's and ballisto-cardiogram "favored the probability of coronary artery disease and angina; that this was not an absolute diagnosis and the complaints could be due to other causes", but the "weight of the evidence" favored this, Garis' first impression. He suggested "common sense and limitation according to symptoms."

Tongue asked Dr. Garis, in view of the possibility Dr. Garis had expressed, not to tell Tongue's family either of Tongue's visits or of the discussion. Tongue's parents were up in years; his wife had just had their first child and was nervous, and he did not want to worry them.

On August 15, 1957, after three conferences with the trust officer and Tongue's father (an insurance agent for many years), it was decided that an additional policy for $50,000 would be desirable.

In connection with an application for additional insurance in the amount of $50,000, with certain payment provisions dependent upon date of death, Tongue was examined on August 31, 1957 by Dr. T. C. Siwinski and on September 5, 1957 by Dr. A. Allan Spier. In each of the interviews his answer was "yes" to the question "Are you now in good health?"

Part II of each application contained certain questions, propounded by the examiner and answered by Tongue, the

3. Based upon the technique developed by a Dr. Masters of having the patient take certain standardized exercises, based upon age, sex and weight, and then taking E K G readings at once, and upon three two-minute intervals. A "double Masters" involves twice the amount of exercise so determined.

4. The absence of an absolute diagnosis, but the "working diagnosis" of heart disease was repeated several times, both on direct and cross examination.

5. This, like the E K G, is an electrical recording, but is a registration of mechanical impulses created by the vibration from the pumping of blood, instead of electrical impulses incident to the heart function. The question of the reliability, vel non, of this technique will later be briefly discussed.

answers being recorded and then signed by Tongue. Questions 5 and 6, and the answers thereto, chiefly are relied upon. They are as follows: [6]

" '5. Have you ever suffered from any ailment or disease of

A. * * *

B. Heart, Lungs?　No.

C. * * *

D. Skin, Middle Ear, Eye, Nose, Throat?　Yes. Name of ailment, etc: Allergic Rhinitis. No. of attacks: Yearly Results, etc: Under Treatment 6–8 years. Noticeable improvement.' "

" '6. A. * * *

B. * * *

C. Have you ever had any accident or injury?　No.

D. Have you ever undergone any surgical operation?　Yes. Name of ailment, etc: T & A Date: 1923 Results, etc: No complications. Name of ailment, etc: Submucous Resection Date: 1951. Results, etc: No complications.

E. Have you ever consulted or been examined or treated by, or under the care of any physician, healer or medical practitioner?　Yes. Name of ailment, etc: Allergic Rhinitis. Results, etc: Dr. W. Winkenwerder, 1114 St. Paul St. #2.' "

---

6. The answers are those given to Dr. Siwinski. The ones to Dr. Spier are substantially identical.

Dr. Siwinski was certain that Tongue made no disclosure as to consultation with Dr. Garis or Dr. Davis; had Siwinski known of such consultations, he would have questioned Tongue as to the reasons, and have entered the answers under 6 E.

Dr. Spier testified that if Tongue had said anything about substernal chest tightness or consultation he would have put it down without attempting to interpret; and would probably have qualified the answer he made as to apparent good health. Specifically, Dr. Spier testified that if he had been told of the visits to Dr. Garis in July and August, and to Dr. Davis in August, this would have been recorded.

Dr. Garis did not continue in close professional contact with Tongue, although he did take an E K G on March 18, 1958, which was within normal limits, and he did prescribe thyroid and had several cholesterol checks made.

Tongue was examined by Dr. Brown, Dr. Garis' associate, on September 19, 1958. Brown's note [7] was to the effect that Tongue felt well except for fatigue at the end of the day; that he experienced no real chest pains, but on rare occasions felt a chest tightness, especially after meals or on exercising, which feeling was relieved by the use of nitroglycerin.

On the afternoon of June 11, 1959, on a hot, humid day, Tongue dropped dead on the golf course as he was about to tee off on the first tee after lunch. The death certificate stated the cause of death as "coronary occlusion". No autopsy was performed, the Assistant Medical Examiner understanding that Tongue had been a known angina patient under private care.

Claim was promptly made for the commuted value of the policy, but after considerable correspondence and some investigation was rejected on the grounds stated at the beginning of this memorandum.

After suit was instituted, and nearly one year after death, defendant requested an autopsy, and after a formal hearing on the motion,[8] Tongue's parents and widow acquiesced. The autopsy was performed by Dr. Russell S. Fisher, the Chief Medical Examiner for Maryland, on June 30, 1960, in the presence of Dr. Edward M. Rehak, Pathologist in Chief at St. Agnes Hospital, who attended on behalf of the plaintiff.

Dr. Fisher found extensive heart disease involving both coronary arteries, which had existed for at least some months before death, evidenced by scarrings; old scars of many months in the heart muscle supplied by the left coronary artery; and as the precipitating cause a recent clot in the right coronary artery, of eight to sixteen hours duration at the time of death.

On the physical findings, and the cause of death [9] there was no disagreement. Considerable evidence was offered by both plaintiff and defendant as to the probable duration of the disease. Defendant called Dr. Robert E. Mason, a specialist in cardio-vascular diseases and the reading of E K G's, who reviewed the Garis E K G's and considered them to indicate probable abnormality, suggestively in the anterior surface of the left ventricle. It also called Dr. Frank W. Davis, Jr., who took the ballisto-cardiographic readings. Those of Tongue were

---

7. On direct examination of Dr. Garis an objection to the reading of this entry was sustained, but defendant brought it out on cross-examination.

8. At the hearing Dr. Russell S. Fisher, the Chief Medical Examiner for Maryland, testified that he believed that despite the lapse of time he probably could determine the cause of death, and possibly fix within limits the period of duration if a heart abnormality were found. He testified that he had performed autopsies, with satisfactory results, at longer intervals after death.

9. Dr. Fisher, and two doctors called by plaintiff, agreed in almost identical language that the recent clot was "the straw that, added to the existing load, broke the camel's back."

abnormal, strongly suggestive of cardio-vascular disease.[10]

Based upon his own findings, Tongue's complaints to Garis, and Garis' E K G's, Dr. Fisher was of the opinion that the diseased heart condition he found prob-ably existed at the time of the Garis examination in July 1957. He admitted that from the autopsy alone the age of the disease could not be fixed, other than that it was of "many months" standing.

Plaintiff's cardiologist and E K G ex-pert, Dr. Milton Lansdowne, was of the opinion that the double Masters E K G did not "show definitely whether or not coronary disease existed;" nor did it point to involvement of the surface of the left ventricle.

Dr. Sidney Scherlis, cardiologist and internist, familiar with E K G and the ballisto-cardiogram, testified that he had heard the testimony of Drs. Garis, Fish-er, Mason and Lansdowne and examined the E K G's; that he could not state that in July 1957 Tongue did have heart dis-ease, nor could he definitely state that he did not; that he shared Dr. Garis' doubts as to the exact diagnosis at that time; and that he doubted that a Masters E K G could localize the area involved.

Dr. Tobias Weinberg, pathologist in chief at Sinai Hospital, in essence agreed with Dr. Fisher's findings. He did not believe it to be possible to estimate the duration of lesions, except that if they were profound, they would be of at least three months duration but the maximum could not be estimated.

Dr. Rehak agreed in essence with Dr. Fisher's microscopic findings. He felt that while occlusions up to three to four weeks could be dated with a fair amount of certainty, it would be pure speculation to attempt a dating of any as old as three to four months.

In short, while there was adequate evi-dence to justify a finding that at the time

Tongue made his application he was not in good health, the jury was not required so to find. The first ground of the motion is therefore insufficient.

### False Statements Materially Affecting the Risk or Hazard.

There remains the question as to whether, in the answers given by Tongue in response to questions in Part II of the application he was guilty of false statements materially affecting the risk or hazard assumed by defendant. On materiality, the examining physicians in effect testified that had Tongue dis-closed that he had consulted Dr. Garis, or been examined by Dr. Davis, these facts would have been recorded, for the information of defendant.

The Assistant Medical Examiner of defendant testified that the defendant had, before Tongue's death, no informa-tion that he had consulted Garis; that he had complained of tightness in the chest or difficulty in breathing; of the Garis E K G and double Masters; of the bal-listo-cardiogram or the revisit to Garis, and Garis' impression. He further testi-fied that this information would have been regarded as material; had it been known, the defendant would not have issued the policy; that it did not insure people who complained of tightness in the chest; they were regarded as bad risks. He further testified that if refer-ence to visits to Dr. Garis or Dr. Davis had appeared in the application, the de-fendant would have written them and asked for reports; and had the reports revealed what those doctors had testified, Tongue's application would not have been accepted and the policy would not have issued.

Although this testimony was not contradicted or impeached, in view of the right of a jury not to believe a witness who has not been contradicted, it becomes necessary to consider whether or not as

10. Dr. Davis frankly testified that the ballisto-cardiograph was not yet widely accepted, and that he and his associates discouraged its indiscriminate use, until it had been further improved. He fur-ther testified that the test was highly significant in the age groups under 45, and that in such age groups he had never seen an abnormal reading in a normal man.

a matter of law the Tongue nondisclosures are material under Maryland law. In this connection the comprehensive language of question 6 E becomes important: "Have you ever *consulted* or been *examined* or *treated* by, or *under the care* of any physician, healer or medical practitioner?" (Emphasis supplied.)

The italicized words serve at once to distinguish such cases as Schloss v. Metropolitan Life Ins. Co., 1939, 177 Md. 191, 203, 9 A.2d 244, where the fact that the insured had "consulted" a doctor was held not inconsistent with a negative answer to the question whether she had "been attended by a physician" within five years; Baker v. Continental Casualty Co., 1953, 201 Md. 464, 470, 94 A.2d 454, 456, where periodic examinations by a physician, at which no medication was given, no treatment prescribed, and no advice given except to return in six months were held not necessarily in conflict with a negative answer to "sickness * * * requiring a doctor's care" (see Monumental Life Ins. Co. v. Taylor, 1957, 212 Md. 202, 211, 129 A.2d 103); and Quillin v. Prudential Insurance Company of America, 4 Cir., 1960, 280 F.2d 771, 774, where diagnostic procedures were held not necessarily inconsistent with a denial of having "been treated for" certain disorders.

█ Moreover, if the misrepresentation is immaterial, or materiality is a question of fact, the policy will not be avoided as a matter of law by a false answer. In Great Eastern Casualty Co. v. Schwartz, 1923, 143 Md. 452, 122 A. 647, it was held that the court rightly refused to take the case from the jury, where the insured had represented sound health, on proof that he had made such answer after advising defendant's agent that he had been treated for bronchitis but the agent had assured him that this was not a serious illness; and when it was at least doubtful that insured then had tuberculosis, for which the claim was filed.

In Hancock Mutual Life Ins. Co. of Boston, Mass. v. Adams, 1954, 205 Md. 213, 107 A.2d 111, a case strongly urged by plaintiff in opposition to the motion, the insured was asked (1) whether he had ever had, or been told that he had, or consulted or been treated by a physician for, pain in the chest or shortness of breath; (2) whether he had had any x-ray, electrocardiac or blood examinations or studies, and (3) whether during the past five years he had consulted any physician, or been confined to or treated in any hospital, sanatorium, dispensary, clinic or similar institution. The respective answers were "No", "Yes. Routine chest x-rays since 1931. All negative" and "No." Insured died within the contestable period of heart failure and uremia. Within the five-year period prior to the application he had consulted physicians on numerous occasions about minor ailments. Such failure to disclose consultations was held not to avoid a policy, particularly where the consultations were not connected with the ultimate cause of death.

But in *Adams*, although the insured had had pains in the chest, and had had an E K G, he believed, as did his doctor, that these were due to a bronchial cause and not to heart disease; and the E K G was negative. The court held the question of materiality to be for the jury because of the divergence of opinion as to the significance of pains in the chest and the general agreement as to "[the] little regard * * * for negative results of an electrocardiographic examination * * *" 205 Md. at page 225, 107 A.2d at page 116.

In Heidenreich v. Metropolitan Life Ins. Co., 1957, 213 Md. 286, 131 A.2d 914, 918, insured had stated in his application that he had never been treated for ulcers when in fact he had. However, one doctor called by the insurer testified that a recent examination had not shown an earlier ulcer; that in his opinion the ulcer did not in any way affect the life span of the insured; and that his death was in no way attributable to the ulcer. Another doctor called by the insurer testified that when persons are "informed that they have an ulcer" they "get slightly neurotic, 'prissy' and careful which

might be in their favor so far as longevity is concerned." 213 Md. at page 292, 131 A.2d at page 918.[11] Death was sudden, which was uncharacteristic of a ruptured or bleeding ulcer. A conflict as to materiality therefore existed, to be resolved by the jury.

" 'A material misrepresentation made by an applicant for life insurance in reliance on which a policy is issued to him, avoids the policy, whether it be made intentionally, or through mistake and in good faith' * * * 'because it results in the assumption by the insurer of a risk different from that which the applicant led it to suppose it was assuming.' " Hancock Mut. Life Ins. Co. v. Adams, 1954, 205 Md. 213, 221, 107 A.2d 111, 114.

A case strikingly in point, in which the court on appeal reversed a judgment for the plaintiff and entered judgment for defendant, is Monumental Life Ins. Co. v. Taylor, 1957, 212 Md. 202, 129 A.2d 103. The facts are so concisely summarized and the applicable law stated in brief compass, that it would be a work of supererogation to attempt to paraphrase what the court itself said (212 Md. 202, at pages 212–213, 129 A.2d at pages 107–108):

"In the case at bar, it is uncontradicted in the record that certain representations relied upon by the appellant were in fact untrue, and in part at least, were known to be untrue by the insured. It is our duty to determine whether they were untrue as to material matters of fact, as a matter of law. He stated he had not consulted or been attended by any physician in the last five years, and that he had never had or consulted or been treated by a physician for a disease of the heart or blood vessels, pain in the chest, shortness of breath, coronary artery disease or angina pectoris. It is undisputed and uncontroverted, indeed the plaintiff admitted, that the insured had consulted Drs. Mattax, Ellis and Gilmore within a period of five years from the date of the application. Unlike the Adams case, supra, Dr. Mattax, a professional man whose qualifications were admitted, thought the insured was suffering from a heart condition; and Dr. Ellis, a specialist in cardiology whose qualifications were likewise admitted, had diagnosed his ailment as angina pectoris and *had actually treated him for it.* This was no minor ailment. Two doctors testified, in their opinion, it was the cause of his death. And it immediately removes the case from the rule that the failure to disclose consultations with physicians for minor or temporary ailments does not void a policy of the nature herein involved. When one of the other rules mentioned above, namely, that material misrepresentations made by an applicant, in reliance on which a policy is issued to him, avoids the policy whether it be made intentionally, or through mistake and in good faith, is applied, the above alone, when uncontradicted, is clear and convincing evidence that the representation was untruthful in law and as a matter of law.

"But this is not all. It was likewise uncontradicted that the insured had consulted and been treated by two physicians for pain in the chest and shortness of breath; and was taking nitroglycerine tablets, a medication that can only be obtained by a prescription and which the average person knows is a palliative for pain resulting from angina pectoris, when he first consulted Dr. Ellis. Without further laboring the question, we hold the evidence is so clear and so overwhelmingly convincing, that the misrepresentation was untruthful as to a material matter of fact, as a matter of law. For previous cases that have held truthfulness and/or materiality were questions of law, see Bankers' Life Ins. Co. v. Miller, 100 Md. 1, 59 A. 116; Mutual Life Ins. Co. v. Mullan, 107 Md. 457, 69 A. 385; Forwood v. Prudential Ins. Co., 117 Md. 254, 83 A. 169; Metropolitan Life Ins. Co. v. Jennings, 130 Md. 622,

11. His testimony did not indicate, however, that he recommended or encouraged ulcers as a means of prolonging life. In fact, he tried to cure insured of his ulcer.

101 A. 608; Loving v. Mutual Life Ins. Co., 140 Md. 173, 117 A. 323; Commercial Casualty Ins. Co. v. Schmidt, supra [166 Md. 562, 171 A. 725]; Metropolitan Life Ins. Co. v. Samis, 172 Md. 517, 192 A. 335.

"The rule with reference to materiality in cases of this kind is not exactly ' * * whether disability of any sort is proved to have existed at the time of making the application, but whether the misrepresentations of the true facts would reasonably have affected the determination of the acceptability of the risk.' Commercial Casualty Ins. Co. v. Schmidt, supra. See also Hancock Mut. Life Ins. Co. v. Adams, supra; Silberstein v. Massachusetts Mut. Life Ins. Co., 189 Md. 182, 55 A.2d 334. In addition to the direct and positive evidence of the proper officials of the appellant that had the true facts been known the risk would not have been accepted, it is widely and generally known and accepted that the ailment, as diagnosed by Dr. Ellis, would have reasonably affected the determination of the acceptability of the risk. There is no doubt that the misrepresentations above mentioned were material."

In this case Tongue himself sought out Dr. Garis because of occasions of tightness across the chest, and difficulty in breathing; Tongue asked for an E K G and a heart check; Tongue was told by Dr. Garis of the results of his examination and of the tests and of Garis' impression of the probability of coronary artery disease and angina; and Tongue asked Dr. Garis not to tell Tongue's family either of Tongue's visits or of the discussion. Certainly both Dr. Garis and Tongue viewed the situation as one of at least probable heart involvement. The court, with full recognition of the serious responsibility of setting aside a jury verdict, (see Manaia et al. v. Potomac Electric Power Co., D.C.D.Md.1958, 163 F.

Supp. 671, 672, affirmed 4 Cir., 1959, 268 F.2d 793, 799, certiorari denied 1959, 361 U.S. 913, 80 S.Ct. 255, 4 L.Ed.2d 183), concludes as a matter of law that the answers given to questions 5 and 6 of Part II of the application for insurance were false and that they materially affected the risk and hazard; and were it necessary, the court would further find that the answers were knowingly and intentionally false, and were known by Tongue to be material.

The clerk is directed to enter judgment. n. o. v. for the defendant.[12]

12. During the trial there was a discussion as to whether or not the jury should be instructed with respect to refund of premiums if their verdict were for the defendant. It was decided not to bring this matter before the jury, and no request was made for any such instruction. Counsel for defendant undertook that if defendant were successful, the premiums would be repaid without the necessity of suit. The judgment will therefore be silent upon this.