UNION TRUST COMPANY OF MARY-
LAND, a body corporate, Trustee of
the Trust Estate of Raymond Kent
Tongue, Jr., deceased, Appellant,

v.

KANSAS CITY LIFE INSURANCE COM-
PANY, a body corporate, Appellee.

No. 8490.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 12, 1962.

Decided March 26, 1962.

William H. Zimmerman, Baltimore,
Md. (W. Frank Every, Baltimore, Md.,
on brief) for appellant.

William B. Kempton, Baltimore, Md.
(Forrest F. Bramble, Jr., Baltimore, Md.,
on brief) for appellee.

Before SOPER, HAYNSWORTH and
BOREMAN, Circuit Judges.

HAYNSWORTH, Circuit Judge.

The District Court entered a judgment
N.O.V. for the insurance company be-
cause of false answers in the applications
for the life insurance policy it had is-
sued. On this appeal, the only substan-
tial contention is that the evidence pre-
sented a jury question. We agree with
the District Court that it did not.

The facts are fully and clearly stated
in the comprehensive opinion of the Dis-
trict Court.[1] We need refer to them here
in less detail.

In July 1957, Dr. Raymond Kent
Tongue, Jr., an orthodontist of Balti-
more, Maryland, then thirty-eight years
old, was advised by his attorney and a

1. 197 F.Supp. 471.

trust officer of the bank which later became the trustee of his estate, to procure additional life insurance. A week later, pursuant to an earlier appointment, he consulted Dr. Robert W. Garis, a medical doctor specializing in cardiology who had also served as the Tongue family physician. Dr. Tongue reported to Dr. Garis recent experiences of tightness across his chest and difficulty in breathing. These had been experienced on the first few holes of golf courses, particularly when he had only recently eaten. He asked Dr. Garis to check his heart.

A Double Masters Electrocardiogram indicated coronary insufficiency. Dr. Garis sent Tongue to a Dr. Frank W. Davis, Jr., who did a "ballistocardiogram," the result of which, as interpreted by Dr. Davis, was reported to Dr. Garis to be abnormal and highly suggestive of coronary heart disease.

Dr. Garis reported to Dr. Tongue that, on the basis of his findings and those of Dr. Davis, he had come to a "working diagnosis" of coronary disease. The results of the tests did not establish the presence of coronary disease beyond all doubt, but it was indicated with sufficient definiteness to enable the doctor to proceed upon that assumption. Tongue asked Dr. Garis not to report the diagnosis to his family.

It was on August 7, 1957, that Dr. Tongue learned of the "working diagnosis" of Dr. Garis. Later that month he applied to the defendant insurance company for a policy of life insurance in the principal amount of $50,000. In that connection, he was examined on August 31, 1957 by Dr. T. C. Siwinski, and on September 5 he was examined by Dr. C. Allan Spier. On each occasion, he informed the examining physician that he was in good health, and that he had never suffered any ailment or disease of the heart. He was asked if he had "ever consulted or been examined or treated by, or under the care of any physician * *," to which he replied that he had consulted Dr. W. Winkenwerder for treatment of allergic rhinitis. He did not disclose his recent examination by Drs. Garis and Davis, their diagnosis or their treatment of him.

These answers were incorporated in applications, signed by Tongue, on the basis of which the insurance was issued.

In June 1959, Dr. Tongue suddenly died while playing golf.

An autopsy disclosed extensive heart disease involving both coronary arteries. There were old scars in the left coronary artery and a recent clot in the right one. It is undisputed that the cause of death was coronary disease, though the precipitating cause was the recent clot.

The findings during the autopsy enabled the medical witnesses to express the opinion that Dr. Tongue had suffered from coronary disease for many months prior to his death. They testified that if all the scarrings were fresh, the time of onset of the disease could be estimated with some accuracy, but, when there were old scarrings, all that could be said was that the onset of the disease occurred many months before the death. It might have been several years earlier.

The District Court concluded that the jury might have drawn a permissible inference that Dr. Tongue was in good health when he applied for the policy of insurance and when it was delivered. He came to this conclusion because the diagnosis of Dr. Garis in August 1957 was not unconditional or entirely certain, while the findings made as a result of the autopsy did not enable the doctors to express a positive opinion that the coronary disease, of which there was then abundant evidence, was actually present in August 1957. He found, however, that the insured's statements in his applications that he had never had any ailment or disease of the heart and his failure to disclose the consultations, examinations and treatment of Drs. Garis and Davis were false beyond doubt, and that his answers to those two questions were material to the risk as a matter of law.

On appeal, most of the effort of the Trustee is directed to the answer to question No. 5B of the applications, in which Dr. Tongue had responded, "No," when

asked if he had ever suffered from any ailment or disease of the heart. The position, essentially, is that while Dr. Tongue may have had reason to believe that he then had a disease of the heart, the diagnosis was inconclusive, and the evidence obtained as a result of the autopsy did not require a finding that Dr. Tongue had heart disease in August and September 1957. It says, whether or not he had actually had heart disease at the time he signed the applications, like the question of his good health at that time, is open to a difference of opinion.

There is no question, however, of the falsity of the answer to question No. 6E, in which the applicant reported a minor ailment and gave the name of the doctor who had treated that minor ailment some years earlier, but in which he failed to disclose the fact of his very recent consultations with Drs. Garis and Davis, their examinations, treatment and diagnosis. The unquestioned falsity of the answer to question No. 6E is compounded by the answer to question No. 5B, for, in combination, they effectively conceal the fact that he had very recently been examined in an effort to determine whether or not he had heart disease, and that the result of the examinations was a working diagnosis that he did. Whether there may be doubt that, as an objective fact, he had heart disease in September 1957, his unequivocal answer to question No. 5B was part of the misrepresentation of his fatally incomplete answer to question No. 6E.

If we should agree with the Trustee that the answer to question No. 5B, considered alone, was not so clearly false, as a matter of law, as to warrant withdrawal of the question from the jury, the answer to question No. 6E is clearly false. The only legal question which required any real consideration by the court was whether, as a matter of law, the misrepresentation in the application was material to the risk.

We agree with the District Court that it was material to the risk as a matter of law.

In Maryland, as is generally held elsewhere, failure to disclose inconsequential ailments in an application for life insurance will not void the policy, nor will a failure to disclose consultations with doctors for the purpose of treatment of such ailments. If the undisclosed ailment is not trivial, the question of its materiality becomes a question which should be determined as one of fact as long as, factually, it is debatable.[2] The materiality of the misrepresentation to the risk may be so obvious, however, that a contrary inference is not permissible.[3]

Here the Assistant Medical Director of the insurance company testified that if the applications disclosed the names of Drs. Garis and Davis and the nature of the examinations made by them, he would have contacted them, and if he had been informed of their findings and the working diagnosis arrived at by Drs. Garis and Davis, the insurance policy would not have been issued. The issue of materiality, however, does not depend, alone, upon the testimony of the official of the insurance company. Heart disease and angina are so patently material to the risk as to be beyond dispute. Evidence that they are probably present in a proposed insured applying for life insurance in the sum of $50,000, if known,

---

2. See Heidenreich v. Metropolitan Life Insurance Company, 213 Md. 286, 131 A.2d 914; John Hancock Mutual Life Insurance Company of Boston, Mass. v. Adams, 205 Md. 213, 107 A.2d 111; Schloss v. Metropolitan Life Insurance Company, 177 Md. 191, 9 A.2d 244; Great Eastern Casualty Company v. Schwartz, 143 Md. 452, 122 A. 647.

3. Monumental Life Ins. Co. v. Taylor, 212 Md. 202, 129 A.2d 103; Metropolitan Life Ins. Co. v. Samis, 172 Md. 517, 192 A. 335; Commercial Casualty Ins. Co. v. Schmidt, 166 Md. 562, 171 A. 725; Loving v. Mutual Life Ins. Co., 140 Md. 173, 117 A. 323; Metropolitan Life Ins. Co. v. Jennings, 130 Md. 622, 101 A. 608; Forwood v. Prudential Insurance Co., 117 Md. 254, 83 A. 169; Mutual Life Insurance Co. v. Mullan, 107 Md. 457, 69 A. 385; Bankers' Life Ins. Co. v. Miller, 100 Md. 1, 59 A. 116.

would cause any insurance company to decline the risk, unless, through additional examinations, the insurance company could satisfy itself with some certainty that there actually was no disease.

As the Maryland Court of Appeals has said of heart disease in a similar context:[4]

"* * * This was no minor ailment * * *. And it immediately removes the case from the rule that the failure to disclose consultations with physicians for minor or temporary ailments does not void a policy of the nature herein involved. * * * *"

The diagnosis made by Dr. Garis was so alarming, even to the applicant, that he concealed it from his family, or, if not alarming to him, he thought it would be to the other members of his family. Heart disease was clearly the cause of his death at the early age of 40. The diagnosis two years earlier of such disease, if not then entirely positive, was of such obvious and immediate importance to the determination of insurability that it cannot reasonably be supposed that it was immaterial to the risk.

In its careful and extended discussion of this legal question, the District Court relied principally upon Monumental Ins. Co. v. Taylor.[5] It was entirely appropriate that it do so. The facts are very similar and the legal issue the same as that here presented. The Trustee undertakes to distinguish the Monumental Ins. Co. case by reference to such things as the fact that the insured there complained of chest pains when he consulted the doctor, while here it is said that the insured complained not of pain, but of tightness in his chest and shortness of breath. Such minor differences aggregated do not become a distinction. Here, as there, the insured's complaint and the examinations and tests made by the doctors were sufficient to support the working diagnosis of coronary disease. It was that diagnosis, which the Maryland Court held to be material to the risk as a matter of law, and misrepresentations in the application, which concealed from the insurance company the fact of that diagnosis, voided the insurance.

Our decision in Quillin v. Prudential Insurance Company of America, 4 Cir., 280 F.2d 771, is of no assistance to the Trustee. While it was established there that the insured had a very dangerous disease of the blood when he applied for the insurance and of which he later died, there was evidence that the insured did not know of it. An applicant for insurance cannot be required to disclose information he does not have, and it was appropriate to require that the issue be submitted to a jury when he could have believed, with reason, that his examination by the doctor disclosed no information of possible materiality to the insurance risk. Here, on the other hand, there is no evidence the insured did not know of the diagnosis of his condition. The evidence is uncontroverted that he did.

The Trustee also complains of the receipt in evidence of a statement, produced by Dr. Garis, in which Dr. Brown, his associate, had recorded the results of a conference with Dr. Tongue on September 19, 1958. Dr. Brown's note contains a statement that Dr. Tongue had reported that the feeling of tightness in his chest, which he experienced on occasion, was relieved by the use of nitroglycerine. The Trustee finds this statement prejudicial, for if nitroglycerine provides such relief from pain or tightness, its effectiveness indicates that the sensation is of coronary origin. The notes prepared by Dr. Garis, himself, contained no reference to nitroglycerine or to its prescription for use by Dr. Tongue. Dr. Garis was of the impression that he had prescribed it, and he knew it was effective in providing relief, but his own notes did not confirm his impression, and his unaided recollection was not certain.

The Brown note was mentioned by Dr. Garis upon his direct examination. Up-

4. Monumental Life Ins. Co. v. Taylor, 212 Md. 202, 129 A.2d 103.

5. 212 Md. 202, 129 A.2d 103.

on objection, the Court excluded it, and no reference was made to the information it contained. On cross-examination, however, counsel for the Trustee cross-examined Dr. Garis about the statement of the witness that Dr. Tongue had reported improvement as to the attacks of chest tightness which he had suffered. Cross-examining counsel, in response, referred to the fact that the doctor had not seen Dr. Tongue for a period of seven months and ten days, to which the doctor responded that, nevertheless, Dr. Tongue had reported that he was improved, and that he had received the information contained in Dr. Brown's report. The Court then admitted Dr. Brown's report, not for the purpose of establishing the truth of the statements contained in it, but to show what information Dr. Garis had.

In this we find no error. The written statement of Dr. Brown had been excluded on direct examination, but it appropriately came in on cross-examination when the witness could explain his conduct, questioned by the cross-examiner, only in terms of the information he had before him at the time he acted.

It is true that, in its opinion, the District Court, in its recital of the facts, referred to the report of Dr. Brown and its contents, and that reference is not related to what Dr. Garis did or did not do after the date of the Dr. Brown report.

There is nothing to suggest, however, that the content of the Brown report influenced the decision of the District Court to grant the motion for judgment N.O.V. While mentioned without qualification in the Court's very full recital of the facts, the motion was granted because of what the record conclusively showed as to the situation existing in 1957, a year earlier than the Brown report. It was the diagnosis made in 1957, based upon reasonable medical evidence, and its concealment by the applicant from the insurance company, that required the entry of judgment in favor of the defendant. Whether or not Dr. Tongue was receiving relief in 1958 by the use of nitroglycerine is immaterial to the question. The District Court might appropriately have

omitted reference to the Brown report, but the mention of it in no way infects the judgment. The record, without the Brown report, so conclusively shows that the answers in the application were false and that they were material to the risk that judgment for the insurance company was required as a matter of law.

Affirmed.