Judith M. FITZGERALD

v.

FRANKLIN LIFE INSURANCE
COMPANY.

Civ. A. No. N–76–675.

United States District Court,
D. Maryland.

Feb. 1, 1979.

K. King Burnett and Ernest I. Cornbrooks, III, Salisbury, Md., for plaintiff.

James R. Bucher, Upper Marlboro, Md., for defendant.

NORTHROP, Chief Judge.

In this case, the plaintiff, Judith M. Fitzgerald, brought suit for payment of a $50,000 insurance policy on the life of her deceased husband, John M. Fitzgerald. The defendant, Franklin Life Insurance Company, defended against the claim on the ground that a material misrepresentation as to the deceased's health on a reinstatement application voided the policy. At the end of all the evidence, the defendant moved for a directed verdict. The Court denied this motion and permitted the case to go to the jury. The jury returned a verdict of $34,000 for the plaintiff. Thereafter, the defendant submitted a motion for judgment notwithstanding the verdict. Upon reconsideration, the Court granted the motion for judgment N.O.V. and advised the parties that it would issue an opinion setting forth

the factual and legal reasons supporting that ruling.

The facts of the case are as follows: Mr. John M. Fitzgerald applied for a $50,000 life insurance policy with Franklin Life Insurance Company in 1968. As a prerequisite to obtaining the policy, Mr. Fitzgerald was asked to fill out an extensive application form and to submit to a medical examination by a physician who would forward the results to the insurance company. Dr. Robert Milligan, M.D. of Pittsburgh, Pennsylvania, gave Mr. Fitzgerald a thorough physical examination in 1968 and reported his results to Franklin Life.[1] In addition, Franklin obtained a detailed background report on Mr. Fitzgerald from the Retail Credit Company, Mt. Lebanon, Pennsylvania. Based on Mr. Fitzgerald's answers on the insurance application, the medical results reported by Dr. Milligan, and the background information provided by the credit company, Franklin Life issued a policy in the amount of $50,000 to John Fitzgerald on October 7, 1968. The primary beneficiary of this policy was the insured's wife, Judith M. Fitzgerald.

Almost five years later, in January 1973, John Fitzgerald consulted Dr. Frank Gantz, M.D., of Berlin, Maryland, several times. *See Defendant's Trial Exhibit 2.* On the initial visit on January 13, 1973, Mr. Fitzgerald complained of diarrhea, lower back pain, fever, sweats, fatigue, fainting spells, and general weakness. His blood pressure was 160/110. On a follow-up visit on January 16, 1973, Mr. Fitzgerald's blood pressure was 152/92 and 150/105 on separate readings. At this time, Mr. Fitzgerald told Dr. Gantz that the state of weakness continued on a periodic basis accompanied by back pain and that he felt numbness in his left leg° while standing for any length of time. Dr. Gantz prescribed Pathribamate, Ampicillin, and Rauzide for the patient. In his trial testimony, Dr. Gantz explained that he prescribed Rauzide, which is a blood pressure medicine, to determine whether the patient had high blood pressure.

The record of treatment from two later visits on January 22, 1973 and January 24, 1973 revealed a blood pressure reading of 120/80. This record also showed that the patient continued to experience back pain and severe night sweats accompanied by fever. In addition, it indicated that Mr. Fitzgerald suffered angina-like pains six to twelve times. In his trial testimony, Dr. Gantz stated that he believed the underlying cause of the patient's problems in January 1973 was a urinary infection. Dr. Gantz stated that he prescribed Ampicillin, a mild drug, for the infection and the patient's blood pressure returned to normal.

On February 19, 1973, Mr. Fitzgerald traveled to Pittsburgh, Pennsylvania and checked into the Pittsburgh Diagnostic Clinic for a complete physical examination.[2] Although it is unclear whether Dr. Gantz referred Mr. Fitzgerald to the Pittsburgh Clinic or whether he went on his own initiative, Mr. Fitzgerald underwent four days of tests. The medical history of the Clinic records outlined his symptoms:

> For approximately a year, Mr. Fitzgerald has been experiencing symptomatology which includes profuse sweating at night and sometimes during the day, associated with a low grade fever up to 100 degrees. Weakness and fatigue have been prominent. When he gets up in the morning there is soreness throughout the back and he feels weak and short of breath. Sometimes it takes several hours before he is able to be sufficiently active to go to work. The shortness of breath which occurs almost entirely in the morning when he first gets out of bed and is not necessarily or even regularly associated with physical activity. Sometimes he feels "weak" and feels that he needs

---

1. The insurance application included a medical history section that requested the examining physician to answer a number of specific questions. The answers to these questions indicated only that John Fitzgerald had been hospitalized in 1949 for a fracture of his lumbar vertebrae and had received x-rays for that injury. *See Plaintiff's Trial Exhibit 1.*

2. According to the trial testimony of Drs. Gantz and Henry, the Pittsburgh Clinic is a highly respected diagnostic institution.

more oxygen in the sense that he recalls his mother acting when she had heart trouble. On these occasions there may also be some pain in the left arm although he doesn't have any chest pain. His response to physical activity such as walking has been poor in that he tires easily, has to walk slowly and has no energy. However, he can't describe either spontaneously or on direct questioning any history of effort bringing on any chest distress or arm pain.

The symptoms have been occurring with greater frequency and more severity. He has really not felt well for the entire year. He saw a doctor during the summer or fall who gave him a complete examination and reported no positive findings. He saw another doctor more recently around Christmas and it was reported that he had some urinary infection and he took a course of Ampicillin which apparently had no effect upon his symptomatology. He did not have urinary symptoms at any time. He has not lost any weight. He sleeps all right except for the need to wake up and change his shirt because of the marked sweating. He hasn't had headaches and he has no history of fainting spells. There have been no ENT symptoms. He smokes cigarettes heavily, may have some chronic cough but no other specific pulmonary disorder. His appetite and digestion have been pretty good except for occasional non-specific indigestion. Occasional mild diarrhea, at least one' or two watery stools have accompanied some of his periods of weakness and perspiring. . . . His family history indicates that his mother died of heart trouble but there are no other familial disorders. [*Defendant's Trial Exhibit 1*].

In the summary, the reviewing physician, Dr. James C. Hayes, M.D. reached the following diagnoses: (1) tension state, (2) diabetes, (3) essential hypertension, mild, and (4) type IV hyperlipoproteinemia, mild. In his discussion of the diagnoses, Dr. Hayes observed that the diagnoses listed were not "necessarily germane to the symptoms which have been occurring and which are described in the history." Instead, Dr. Hayes felt that the symptoms were more related to a tension state than to any specific illness. He also believed that many of the symptoms, such as sweating, fever, and fatigue, were more related to excessive smoking, occasional excessive drinking, and possibly tension. Dr. Hayes also discussed several test results. He noted that the glucose tolerance test showed the presence of a mild diabetic response. Because the test was performed on the last day Mr. Fitzgerald was at the Clinic, follow-up tests were not possible. However, Dr. Hayes suggested that this test finding should have further ongoing follow-up and that it could be carried out by Mr. Fitzgerald's personal physician in Maryland. Besides mild cholesterol and triglyceride elevation, all the other findings were normal and established to the Clinic's satisfaction that there was no infectious process present.

The examinations at the Pittsburgh Clinic included a cardiac consultation with Dr. Daniel M. Wilkins, M.D. *See Defendant's Trial Exhibit 1.* In his report, Dr. Wilkins noted similar symptoms to those set forth in the medical history. He also observed that Dr. Gantz' examination the preceding month had revealed elevation of enzymes, cholesterol, and blood pressure and that Mr. Fitzgerald had been taking a hypotensive agent. According to Dr. Wilkins, Mr. Fitzgerald was told the illness was a urinary tract infection and was given Ampicillin to remedy it.

In addition to his observations on Dr. Gantz' findings, Dr. Wilkins presented his own test results and conclusions. His examinations revealed normal fundi and blood pressure of 130/80. Tests also showed that the heart size and sounds were normal as were the electrocardiogram and chest x-ray. Lab data did reveal, however, elevation of two-hour glucose tolerance and cholesterol. Dr. Wilkins concluded his remarks by focusing on the patient's lack of physical activity and "considerable business pressure." Additionally, he found that Mr. Fitzgerald smoked several packs of cigarettes daily and that several times a week he would

have ten to twelve drinks in the course of a day. From the test data and these observations, he derived the impression that Mr. Fitzgerald was experiencing psychophysiologic symptoms and characterized him as a type IV hyperlipidemia.

On February 22, 1973, Mr. Fitzgerald completed the tests at the Pittsburgh Diagnostic Clinic and returned to Ocean City, Maryland. As he was later to characterize the Clinic's findings in a subsequent hospital stay, Mr. Fitzgerald believed the doctors had diagnosed his condition as "severe stress and strain." He did not return to see Dr. Gantz nor did he seek a follow-up on the diagnosis of mild diabetes, as recommended by the Clinic doctors.

Mr. Fitzgerald's next medical examination occurred in July of 1973. On or about July 25, 1973, Mr. Fitzgerald had a tooth treated by a dentist in Ocean City, Maryland. Shortly thereafter, the tooth became very painful and he was unable to eat or sleep. In addition, he had dizzy spells. On July 27, he had the tooth extracted by a dentist who also prescribed Darvon. Later that day, Mr. Fitzgerald was admitted to Peninsula General Hospital in Salisbury, Maryland with symptoms of dizziness, fainting, nausea, vomiting, and inability to sit up. On admission, his blood pressure was 204/110. Other tests were taken, such as a chest x-ray, and the results were normal.

In a letter to the patient's local physicians concerning the hospital stay, Dr. Wilbur Ellis, one of the hospital physicians, stated that the illness had been diagnosed by Dr. Bernard Dormer, D.D.S. as questionable septicemia and alveolitis. *See Defendant's Trial Exhibit 3.* Dr. Dormer had recommended a course of antibiotics and the symptoms had disappeared by the time of discharge. Dr. Ellis noted that Mr. Fitzgerald's blood pressure was 204/110 on admission and dropped to 130/80 on discharge and concluded that the patient "certainly justifies further medical evaluation in view of his hypertension but he did not wish to have this done while here since he came from another part of the country."

Mr. Fitzgerald had no other recorded medical examinations from the time he left Peninsula General Hospital in July 1973 until he re-entered the hospital in July 1975. In the interim, he failed to make a premium payment on his life insurance, and the policy lapsed in December 1974. Mr. Fitzgerald was given the opportunity to apply for reinstatement by answering questions on the form that provided notice of the policy's lapse. The form, a copy of which appears below, contained five questions. *See Defendant's Trial Exhibit 6.* Question five, which dealt with medical information, inquired:

> Has any person insured (including any dependent child acquired since the policy was issued) under this policy been ill or injured, or consulted, been treated or attended by a physician or practitioner or been a patient in a hospital or sanitarium within the last 5 years? ☐ No ☐ Yes (Details *)

The insurance company provided the following structure and space for a detailed answer to question five:

[See following illustration.]

532

REINSTATEMENT APPLICATION FOR POLICY INDICATED ON REVERSE - READ CAREFULLY

1 My occupation *REAL ESTATE SALESMAN*   2 My height *6* ft. *0* ins   3 My weight *125* lbs.

4. Are all persons insured now in good health? ☑Yes ☐ No (Details*)

5 Has any person insured (including any dependent child acquired since the policy was issued) under this policy been ill or injured, or consulted, been treated or attended by a physician or practitioner or been a patient in a hospital or sanitarium within the last 5 years? ☐ No ☑ Yes (Details*)

| NAME OF PERSON | DATE | NATURE OF ILLNESS OR INJURY | DURATION | IS RECOVERY COMPLETE | NAME AND ADDRESS OF PHYSICIAN, PRACTITIONER, HOSPITAL OR SANITARIUM |
|---|---|---|---|---|---|
| JOHN M FITZGERALD | JULY 1973 | REMOVAL OF Tooth caused infection | 3 days | yes | BERNARD J. DORMER JR DDS SALISBURY MD PENINSULA GENERAL HOSP. SALISBURG MD. |

I declare and affirm that the answers above, to the best of my knowledge and belief, are complete and true. To the extent permitted by statute, if any such material statements or answers shall prove to be incomplete or untrue, reinstatement granted thereon shall be void and of no effect notwithstanding the incontestability provision in the policy The Company shall not contest the reinstatement on the basis of such representations after the reinstated policy has been in force during the lifetime of the Insured for 2 years from the date of this application.
   I authorize any physician, hospital employee or other person to disclose to The Franklin Life Insurance Company any information heretofore or hereafter acquired while attending in a professional capacity any person insured

2/19/75   md   John M Fitzgerald   Judith M. Fitzgerald
DATE   STATE**   SIGNATURE OF APPLICANT   SIGNATURE OF OWNER (IF OTHER THAN APPLICANT)
Form 3575-C   *Attach a sheet if needed   **In South Carolina 'during the lifetime of the Insured' above is deleted.   PRINTED IN U S A.

The asterisk next to "details" referred the applicant to a statement at the bottom of the form that directed him to "attach a sheet if needed."

Mr. Fitzgerald answered question five in the following manner. He indicated a three day treatment in July 1973 by Dr. Bernard J. Dormer, D.D.S., at the Peninsula General Hospital in Salisbury, Maryland for an infection caused by the removal of a tooth. Mr. Fitzgerald also noted a complete recovery from that infection. However, he did not reveal any other medical examinations in the last five years on the form, nor did he attach an additional sheet that contained such information. Both he and his wife, Judith M. Fitzgerald, signed the application form on February 19, 1975. They also signed a form that authorized release of medical records or medical knowledge about them to the Franklin Life Insurance Company. *See Defendant's Trial Exhibit 7.*

On the basis of the Fitzgeralds' answers on the application form, the Franklin Life Insurance Company reinstated their policy. The next major event occurred on July 14, 1975, when Mr. Fitzgerald was admitted to Peninsula General Hospital. His condition was diagnosed as arteriosclerotic cardiovascular disease, with severe three-vessel coronary artery disease with acute coronary insufficiency and subendocardial damage. The treating physicians recommended surgery at Johns Hopkins University Hospital, but Mr. Fitzgerald refused. On October 10, 1975, he died from an acute myocardial infarction.

On October 24, 1975, Judith M. Fitzgerald sent a letter to the Franklin Life Insurance Company accompanied by copies of her husband's death certificate and the life insurance policy. The letter requested immediate cash payment as soon as possible. On November 11, 1975, Mrs. Fitzgerald had an interview with a claims specialist acting on behalf of Franklin Life. In addition, Franklin Life claims agents investigated Mr. Fitzgerald's medical history and discovered, for the first time, the visits to Dr. Gantz in January 1973, the Pittsburgh Diagnostic Clinic in February 1973, and the Peninsula General Hospital in July 1973, at least insofar as that visit related to Mr. Fitsgerald's confinement for hypertension.

Dr. William Henry, a medical examiner for Franklin Life, examined the recorded results of the visits to Dr. Gantz, the Pittsburgh Diagnostic Clinic, and the Peninsula General Hospital in 1973 and determined that the policy would not have been reinstated on February 19, 1975 if all the medical information had been known. As a result, Mr. Robert J. Mulvihill, Assistant Vice President and Claims Director for Franklin Life Insurance Company, sent a

letter to Mrs. Fitzgerald informing her that the Company had decided to rescind the reinstatement of the policy, due to the effect that the newly discovered medical evidence would have had on the reinstatement decision in February 1975.[3] The letter also stated that Franklin Life would refund all premiums paid since the date of reinstatement.

On April 6, 1976, Mrs. Judith Fitzgerald filed a declaration against Franklin Life Insurance Company in the Circuit Court for Worcester County, Maryland. Franklin Life requested removal of the case to the United States District Court for the District of Maryland under 28 U.S.C. § 1441(a) (1976). On May 7, 1976, the removal was effected. The case was tried before a jury in this Court on August 7, 1978.

At trial, three witnesses testified: Mrs. Fitzgerald[4] and Dr. Frank Gantz for the plaintiff and Dr. William Henry for the defendant. In addition, copies of the Fitzgerald life insurance policy and medical records from Dr. Gantz, Pittsburgh Diagnostic Clinic, and Peninsula General Hospital visits in 1973 were submitted as trial exhibits. The trial testimony focused on the contents of the medical records for the three visits. Dr. Henry discussed the steps taken by Franklin Life in investigating Mrs. Fitzgerald's claim and gave his interpretation of Mr. Fitzgerald's medical records that led to the decision to decline reinstatement of the policy and deny the beneficiary's claim for benefits. Dr. Henry identified high blood pressure readings, diabetes, and chest pains as three conditions present in the medical records which, taken together, moved Franklin Life to decline the reinstatement of the policy. Dr. Henry also indicated that each of these conditions, treated separately, could have resulted in a rating of the Fitzgerald policy.[5]

Dr. Henry also articulated the standard of review assumed by insurance company doctors in determining whether a policy should be accepted, declined, or rated. According to Dr. Henry, an underwriter must obtain a composite picture of the individual applying for coverage. Physical symptoms that appear during a medical examination are considered on a group, rather than an individual, basis. Normally, standard underwriting rules are applied to these symptoms. The insurer does this because he must judge, on the basis of the medical information before him, not the present condition of the applicant but "what is going to happen in the long run with this individual." For example, Dr. Henry testified that an insurer can predict with accuracy that someone with current blood pressure readings fluctuating between 150 and 92 may have blood pressure readings fluctuating between 170 and 100 in ten or twelve years. Furthermore, he stated that an insurance doctor looks to such factors as the frequency with which an individual has a certain kind of pain or the failure of a person to seek adequate medical care for an identified condition. Through Dr. Henry's testimony, it became apparent that all of these factors must be considered by the insurer in the decision to assume the applicant's life risk.

In his trial testimony, Dr. Frank Gantz explained the results of his treatment of John Fitzgerald in January 1973 and interpreted the medical results from Mr. Fitzgerald's visits to the Pittsburgh Diagnostic Clinic and the Peninsula General Hospital in the same year. With regard to his own treatment of the insured, Dr. Gantz testified that the underlying cause of the patient's symptoms of low back pain, diarrhea,

---

3. *See Mulvihill letter,* dated December 29, 1975, Exhibit B attached to plaintiff's declaration.

4. In her testimony, Mrs. Fitzgerald discussed the Pittsburgh Clinic visit and stated that she did not know who had referred her husband to the Clinic. In addition, she testified that she did not know whether Mr. Fitzgerald had seen a copy of the Pittsburgh Clinic's report.

5. In the insurance industry, the term "rating" is used to signify the decision to accept the insurance policy, but to charge the insured a reduced or additional cost in premium payments to reflect a risk that is more or less than the standard risk normally assumed by the insurer. For example, an indication of diabetes may result in higher premium payments by the insured in order to obtain the insurance policy.

fever, sweats, fatigue, and general weakness was a urinary infection that disappeared after he prescribed Ampicillin for it. He also stated that indications of high blood pressure diminished substantially with treatment and that Mr. Fitzgerald's complaint of experiencing angina-like pain six to twelve times only evidenced a general chest area pain that was not related to cardiovascular disease.

In his review of the Pittsburgh Diagnostic Clinic records, Dr. Gantz found that those records showed no physical reason for Mr. Fitzgerald's complaints. Dr. Gantz also concluded that there was no basis for the working diagnosis of essential hypertension, mild found in the Pittsburgh records and little evidence substantiating a clinical diagnosis of diabetes. Finally, Dr. Gantz observed that Mr. Fitzgerald's summarization of the Pittsburgh Clinic's diagnosis as "severe stress and strain," in reporting his medical history to the Peninsula General Hospital in 1973, was a fair estimate of the conclusions reached by that Clinic.

In his examination of the Peninsula General Hospital records for Mr. Fitzgerald's July 1973 visit, Dr. Gantz found a strong possibility existed that the insured's elevated blood pressure readings upon admission were associated with the elevation of his temperature due to the infection caused by removal of his tooth.

In general, Dr. Gantz concluded that the symptoms and test results included in the medical records from all three visits did not satisfy him that Mr. Fitzgerald had either hypertension, diabetes, or angina. As a caveat in his discussion of possible diabetes, however, Dr. Gantz advised the examining counsel that he did not know what the insurance companies would think about the symptoms and test results in the medical records.

## LAW

■ The general rule in this area of the law is that a material misrepresentation in the form of an incorrect statement in an application invalidates a policy issued on the basis of such application. *Hofmann v.* *John Hancock Mutual Life Ins. Co.*, 400 F.Supp. 827, 829 (D.Md.1975) (*citing Mutual Life Ins. Co. v. Hilton-Green*, 241 U.S. 613, 36 S.Ct. 676, 60 L.Ed. 1202 (1916)); *see Annot.*, 26 A.L.R.3d 1061, 1065 (1969). The insurer may avoid the policy regardless of whether the material misrepresentation is made intentionally, or through mistake and in good faith. *See John Hancock Mutual Life Ins. Co. v. Adams*, 205 Md. 213, 221, 107 A.2d 111 (1954); *Baker v. Continental Casualty Co.*, 201 Md. 464, 94 A.2d 454 (1953). *See also Schloss v. Metropolitan Life Ins. Co.*, 177 Md. 191, 9 A.2d 244 (1939); *Metropolitan Life Ins. Co. v. Samis*, 172 Md. 517, 192 A. 335 (1937). These general principles have been codified in Md.Ann.Code, art. 48A, § 374 (1957):

All statements and descriptions in any application for a life or health insurance policy or annuity contract, or for the reinstatement or renewal thereof, by or in behalf of the insured or annuitant, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under such policy or contract unless either:

(1) Fraudulent; or

(2) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

(3) The insurer in good faith would either not have issued, reinstated, or renewed the policy or contract, or would not have issued a policy or contract in as large an amount, or at the same premium or rate, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

■ A court must engage in a two-pronged inquiry to determine whether the insurer may validly rescind the policy. First, the Court must decide whether a misrepresentation occurred. Although the good or bad faith of the insured is irrelevant, the Court may consider whether the

question directed to the insured was reasonably designed to elicit information material to the risk. *See Government Employees Insurance Co. v. Cain,* 226 F.Supp. 589 (D.Md.1964); *Erie Insurance Exchange v. Lane,* 246 Md. 55, 227 A.2d 231 (1967), *overruled on other grounds, Cohen v. American Home Assurance Co.,* 255 Md. 334, 258 A.2d 225 (1969); *Baker v. Continental Casualty Co., supra; cf. Nationwide Mutual Ins. Co. v. McBriety,* 246 Md. 738, 230 A.2d 81 (1967). If the application form prepared by the insurance company is ambiguous, it must be construed in a manner favorable to the policyholder. *See Peoples Life Ins. Co. v. Jerrell,* 271 Md. 536, 542, 318 A.2d 519 (1974). Furthermore, if the insurer can be shown to have known that the insured's answers were false and nevertheless made payment on the policy, the insurer can be held to have waived his right to rescind the policy on the basis of the misrepresentation. *See Serdenes v. Aetna Life Ins. Co.,* 21 Md.App. 453, 319 A.2d 858 (1974). These principles contained in these cases place the burden upon the insurer to establish fraud or misrepresentation by the insured in the application for insurance. *See Cohen v. American Home Assurance Co., supra* 255 Md. at 342, 258 A.2d 225 (1969). Nevertheless, Maryland law still imposes a heavy burden on the applicant to be responsible for all statements in or omissions from the application submitted by him. *See Blair v. Prudential Ins. Co. of America,* 153 U.S. App.D.C. 281, 472 F.2d 1356, 1361 (1972) (Kaufman, J., sitting by designation).

As the second part of the test, the Court must determine whether the misrepresentation was material to the risk assumed by the insurer. *See Hofmann v. John Hancock Mutual Life Ins. Co., supra* at 830. For a definition of materiality, the court in *Hofmann* looked to a statement by the Maryland Court of Appeals in *Metropolitan Life Ins. Co. v. Samis,* 172 Md. 517, 192 A. 335 (1937):

"A fair test of the materiality of a fact is found, therefore, in the answer to the question whether reasonably careful and intelligent men would have regarded the fact, communicated at the time of effecting the insurance, as substantially increasing the chances of the loss insured against."

*Id.* at 524, 192 A. at 338; *see Monumental Life Ins. Co. v. Taylor,* 212 Md. 202, 129 A.2d 103 (1957); *John Hancock Mutual Life Ins. Co. v. Adams,* 205 Md. 213, 107 A.2d 111 (1954); *Commercial Casualty Ins. Co. v. Schmidt,* 166 Md. 562, 171 A. 725 (1934); *cf. Jannenga v. Nationwide Life Ins. Co.,* 109 U.S.App.D.C. 385, 288 F.2d 169, 172 (1961). Another court has stated the test of materiality more succinctly as whether the false representation "would reasonably influence the insurer's decision as to whether it should insure the applicant." *Silberstein v. Massachusetts Mutual Life Ins. Co.,* 189 Md. 182, 190, 55 A.2d 334, 339 (1947). Whichever definition is used, the materiality inquiry focuses on what the insurer's use of the undisclosed information would have been in determining the life risk of the insured at the time of application for the policy rather than the relationship of the information to the disease that caused the insured's death. *See Hofmann, supra* at 831; *Metropolitan Life Ins. Co. v. Samis, supra,* 172 Md. at 528, 192 A. 335.

Traditionally, minor ailments and consultations with doctors for treatment of minor ailments are deemed not to be material to the risk assumed by the insurer. *See Union Trust Co. v. Kansas City Life Ins. Co.,* 300 F.2d 606 (4th Cir. 1962); *Hofmann v. John Hancock Life Ins. Co., supra; John Hancock Mutual Life Ins. Co. v. Adams, supra; Silberstein v. Massachusetts Mutual Life Ins. Co., supra; Aetna Life Ins. Co. v. Millar,* 113 Md. 686, 78 A. 483 (1910). If the undisclosed ailment is not minor, the question of materiality is at issue and is normally one of fact for the jury to decide. *Union Trust Co. v. Kansas City Life Ins. Co., supra* at 608; *see John Hancock Mutual Life Ins. Co. v. Adams, supra; Baker v. Continental Casualty Co., supra; Heidenreich v. Metropolitan Life Ins. Co.,* 213 Md. 286, 131 A.2d 914 (1957). However, the materiality of the misrepresentation to the risk may be so obvious that the Court must rule as a matter of law that the misrepresentation is

material. *Hofmann v. John Hancock Mutual Life Ins. Co., supra* at 829; *Union Trust Co. v. Kansas City Life Ins. Co., supra* at 608; *Metropolitan Life Ins. Co. v. Samis, supra; Monumental Life Ins. Co. v. Taylor, supra; Loving v. Mutual Life Ins. Co.*, 140 Md. 173, 117 A. 323 (1922); *Mutual Life Ins. Co. v. Mullan*, 107 Md. 457, 69 A. 385 (1908). In other words, if it is manifest from uncontradicted testimony or from the nature of the misrepresentations that the insured's false representations have been material to the risk, the Court must so find as a matter of law. *Commercial Casualty Co. v. Schmidt, supra*, 166 Md. at 569, 171 A. 725.

A finding of materiality as a matter of law has not been uncommon in Maryland case law. *See Union Trust Co. v. Kansas City Life Ins. Co., supra; Hofmann v. John Hancock Mutual Life Ins. Co., supra; Monumental Life Ins. Co. v. Taylor, supra; Commercial Casualty Co. v. Schmidt, supra; Loving v. Mutual Life Ins. Co., supra; Metropolitan Life Ins. Co. v. Jennings*, 130 Md. 622, 101 A. 608 (1917); *Forwood v. Prudential Ins. Co. of America*, 117 Md. 254, 83 A. 169 (1912); *Mutual Life Ins. Co. v. Mullan, supra; Bankers Life Ins. Co. v. Miller*, 100 Md. 1, 59 A. 116 (1904). *But see John Hancock Mutual Life Ins. Co. v. Adams, supra; Baker v. Continental Casualty Co., supra.* For example, in *Hofmann*, the court found that Maryland cases afforded a strong precedent that a misrepresentation about alcoholism is, by its nature, material to the risk. *Id.* at 830. Similarly, at least one court has read the decision in *Union Trust* as recognizing a presumption created by Maryland law that risk is affected when the insured fails to reveal consultations with doctors concerning the diagnosis of heart disease. *See Oregon Nat'l Life Ins. Co. v. Superior School Photo Serv., Inc.*, 462 F.2d 1235 (9th Cir. 1972), *cited in Hofmann v. John Hancock Mutual Life Ins. Co., supra* at 829 n.4. *Union Trust*, itself, acknowledged that heart disease and angina, even if only probably present in the insured, are "so patently material to the risk as to be beyond dispute." *Union Trust Co. v. Kansas City Life Ins. Co., supra* at 608; *accord Monumental Life Ins. Co. v. Taylor, supra* 212 Md. at 212–13, 129 A.2d 103.

Although Maryland courts frequently have found materiality to be a question of law, the development of a standard analytical framework for the resolution of these issues of what constitutes materiality and whether it is a question of law or fact has been slow and inconsistent. The State Court of Appeals has recognized that no two cases in this field of the law are entirely similar. *See Nationwide Mutual Ins. Co. v. McBriety*, 246 Md. 738, 746, 230 A.2d 81 (1967). Because of this lack of comparable factual situations, Maryland courts have tended to decide the issues on the basis of the particular facts and circumstances present in each case. *Compare Union Trust Co. v. Kansas City Life Ins. Co., supra; Nationwide Mutual Ins. Co. v. McBriety, supra*; and *Monumental Life Ins. Co. v. Taylor, supra* with *John Hancock Mutual Life Ins. Co. v. Adams, supra*. *Hofmann* is the only case to date that attempts to develop standard factors to guide courts in examining the facts and circumstances before them. In that case, Judge R. Dorsey Watkins set forth several considerations relevant to the materiality inquiry. Those considerations are: (1) the nature of the undisclosed ailment, (2) the extent of nondisclosure of medical visits, (3) the contrast between disclosed ailments and visits and nondisclosed ones, (4) the relationship between the nondisclosed ailment(s) and the cause of death, and (5) the present posture of the case. *Hofmann v. John Hancock Mutual Life Ins. Co., supra* at 830–34. As a final step in the analysis, Judge Watkins suggested a balancing of the equities since material misrepresentation is an equitable defense. *Id.* at 834; *see Blair v. Prudential Life Ins. Co., supra.*

This Court will adopt Judge Watkins' framework in analyzing the materiality issue. First, however, the Court must determine whether a misrepresentation has occurred in this case. The question Mr. Fitzgerald answered on the reinstatement form asked him whether he, or any other person insured under the policy, had been ill or injured or consulted, been treated or at-

tended by a physician or practitioner or been a patient in a hospital or sanitarium within the last five years. Although the reinstatement form did not provide a generous amount of space for the applicant's answer, the Court finds that the form's design, when viewed in light of the instruction to attach an additional sheet of paper if necessary, was structured adequately enough to elicit a complete answer to this inquiry. *But see Erie Insurance Exchange v. Lane, supra; Baker v. Continental Casualty Co., supra.*

Mr. Fitzgerald's response to the medical history question indicated only one medical visit—a hospital stay at Peninsula General Hospital in 1973 for treatment of an infection caused by removal of a tooth. The applicant did not include, either on the reinstatement form or on an additional sheet of paper, information concerning his visits to Dr. Frank Gantz and the Pittsburgh Diagnostic Clinic in 1973. Since the insurer's question plainly requested such information and Mr. Fitzgerald failed to provide it, this Court concludes that the nondisclosure of these medical visits was a misrepresentation.

The possibility that Franklin Life could have discovered the existence of the Gantz and Pittsburgh Clinic visits by requesting the medical records for the Peninsula General Hospital visit disclosed on the reinstatement form does not alter this conclusion. Mr. Fitzgerald revealed only a hospital visit for an infection caused by a tooth removal. In view of the materiality exception under Maryland case law for minor ailments, this information does not impose a duty upon the insurer to investigate the applicant's medical history further. Likewise, the provision of this information in a reinstatement form, rather than the original application, limits the insurer's responsibility to have engaged in a more extensive investigation before reinstating the policy. More important than the possibility of discovery is the fact that Franklin Life did not know of the visits to Dr. Gantz and the Pittsburgh Clinic or the extent of treatment at the Peninsula General Hospital pri-

or to John Fitzgerald's death in October 1975. Without such knowledge and without the provision of information on the form that would trigger an investigation leading to such knowledge, *see Haubner v. Aetna Life Ins. Co.,* 256 A.2d 414, 417 (D.C.C.A. 1969), the insurance company cannot be held to have waived its right to rescind the policy on the basis of the applicant's misrepresentation. *See Serdenes v. Aetna Life Ins. Co., supra.*

Having concluded that a misrepresentation occurred, the Court now must determine whether the omitted information was material to the risk assumed by the insurer. The Court will use the factors identified by Judge Watkins in *Hofmann* to structure its resolution of the materiality issue.

The first factor in the *Hofmann* analysis is the nature of the undisclosed ailment. In his visits to Dr. Gantz and the Pittsburgh Diagnostic Clinic in 1973, Mr. Fitzgerald presented complaints of diarrhea, lower back pain, fever, profuse sweating at night, fatigue, fainting spells, shortness of breath, and general weakness. The symptoms were occurring with greater frequency and more severity, and Mr. Fitzgerald reported that he had not been feeling well for the entire year. Although Dr. Gantz thought a urinary infection was the underlying cause of the symptoms and the Pittsburgh Clinic believed they were based on a tension state, the true cause of the patient's complaints was never conclusively identified. However, the medical examinations revealed some high blood pressure readings which led Dr. Gantz to prescribe Rauzide, a blood pressure medicine, the Pittsburgh Clinic to diagnose the patient's condition tentatively as essential hypertension, mild, and the doctor at the Peninsula General Hospital to suggest further medical evaluation "in light of [Fitzgerald's] hypertension." Testing by Dr. Gantz and the Pittsburgh Clinic also uncovered mild cholesterol and triglyceride elevations and a diabetic response for which the patient failed to obtain suggested follow-up evaluation. In addition, Mr. Fitzgerald complained to Dr. Gantz of experiencing angina-like pains six to twelve times.

Other results from medical tests performed during Mr. Fitzgerald's visits were normal. Examinations at the Pittsburgh Clinic revealed that the fundi, heart size and sound, electrocardiogram, and chest x-ray ware normal. Likewise, several of the blood pressure readings were in the normal range. At the Peninsula General Hospital, other tests administered upon admission of the patient, such as a chest x-ray, rendered usual results.

At trial, the testimony of Drs. Henry and Gantz focused on the nature of the patient's ailments and what the aforementioned medical information meant to each of them. Dr. Henry found that the symptoms and test results showed indications of hypertension, diabetes, and angina or chest pain complications. He emphasized that the failure of Mr. Fitzgerald to obtain follow-up evaluations was of great significance to the insurer in deciding whether to assume the life risk. Furthermore, Dr. Henry repeatedly stated his position that the role of the insurance company doctor is not to diagnose the insured, but to use the information from the medical records to predict the long-range physical health of the applicant. Based on this standard of review, he concluded that the evidence in the records of high blood pressure, diabetes, and angina pain was highly material to the life risk the insurer would be assuming and required him to decline to reinstate the Fitzgerald policy on the basis of poor life risk.

Dr. Gantz viewed the information in his own records and those of the Pittsburgh Clinic and the Peninsula General Hospital as a clinician. He stated that he did not find substantial evidence to support diagnoses of hypertension and diabetes. He further averred that the angina-like pains reported to him by Mr. Fitzgerald were general chest pains that were unrelated to cardiovascular disease. Dr. Gantz also emphasized that other tests, such as the fundi and electrocardiogram, which returned normal results, were much more significant to the inquiry of whether the patient had hypertension than simple blood pressure readings. Finally, the doctor pointed out that the glucose test upon which the finding of diabetes was based lacked completeness since the Pittsburgh Clinic omitted the four- and six-hour glucose readings that could have been taken as part of the testing procedure.

In judging the nature of Mr. Fitzgerald's ailments, this Court first observes that the standard of review identified by Dr. Henry is the proper measure of the nondisclosed medical information's importance to the materiality inquiry. The medical information need not support a clinical diagnosis of a certain disease or illness. See Union Trust Co. v. Kansas City Life Ins. Co., supra ; Monumental Life Ins. Co. v. Taylor, supra. For example, the Fourth Circuit in Union Trust found that both in that case and in Taylor the insured's complaints and the examination and tests made by doctors were sufficient to support working diagnoses of coronary disease. Union Trust Co. v. Kansas City Life Ins. Co., supra at 609. The Court did not require that coronary disease actually be present but found that even if it was only probably present, the nondisclosed information was material to the risk as a matter of law. In Hofmann, the court found evidence of heavy drinking and smoking to be relevant to the materiality question, even though it did not specifically refer to an explicit clinical diagnosis of alcoholism or lung cancer in its written opinion. Hofmann, supra at 835. Although these cases do not provide a definitive answer to the question of what level of seriousness the medical information must attain before it may be considered in the materiality inquiry, this Court infers from Union Trust, Hofmann, and Taylor that the symptoms reported by the insured and the examination and test results of the physician are the proper focus of the materiality issue and need not be accompanied by a clinical diagnosis before a court can find the insured's nondisclosure to be material as a matter of law.

Based on this conclusion, the Court finds that the evidence in the record reveals that the insured suffered from serious physical complications that could not be conclusively

diagnosed clinically. The medical history of the Pittsburgh Clinic indicates a health problem that certainly was not minor either in its consequences or its origins. *See* pages 529–530 *supra.* Furthermore, the examinations and tests during the three medical visits in 1973 show signs of high blood pressure, diabetes, and relatively frequent chest pains. The seriousness of these signs increased, at least from an insurance perspective, when Mr. Fitzgerald failed to obtain follow-up evaluations for the possibilities of diabetes and hypertension. The effect of each of these possible ailments on the other further enhanced the gravity of the problem for insurance purposes. Dr. Henry testified that when hypertension and diabetes are combined in an applicant the probability of a shortened life expectancy grows markedly. In total, Mr. Fitzgerald's ailments, although not clinically diagnosed, were of a serious nature from a medical point of view, and of an even more grave character from an insurance perspective.

The second factor in the *Hofmann* analysis is the extent of nondisclosure of medical visits. In this case, Mr. Fitzgerald failed to disclose several visits to Dr. Gantz in January 1973 and a trip to Pittsburgh, Pennsylvania in February 1973 for a complete physical examination at a highly respected diagnostic clinic. The Court considers these visits to be too substantial in their examination and testing and too long in duration to permit their characterization as routine checkups. Instead, the Court finds that the continual treatment by Dr. Gantz and the need to travel several hundred miles to obtain further treatment at a highly respected diagnostic clinic provide substantial evidence supporting the materiality of the undisclosed information.

Under the third factor in the *Hofmann* test, the Court must compare disclosed ailment(s) and visit(s) with undisclosed ones. Here, the insured revealed a hospital stay for treatment of an infection caused by a tooth extraction. The Court already has characterized the ailment as one of minor importance. The Court also has previously described the undisclosed information as serious in nature. In *Apolskis v. Concord*

*Life Ins. Co.,* 445 F.2d 31 (7th Cir. 1971), a case quoted by Judge Watkins in *Hofmann,* the court dealt with the selective undisclosure of information and commented:

> The applicant cannot be the judge of the materiality of his health problems; he must disclose all information known to him and permit the insurer to determine its materiality. . . . If the insured did not believe his heart condition was material to the risk to be undertaken by Concord, then why did he suppress it? In a layman's mind the heart condition would be no less material than the hernia. The inference is clear that he disclosed the hernia because he believed it not material to Concord's acceptance of his application, but suppressed the heart condition because he thought it material.

*Id.* at 35. The possibility of a similar inference of materiality in this case is apparent. The insured revealed an infection caused by dental treatment, but failed to disclose much more serious information concerning a plethora of symptoms and ailments that he very likely thought would be of great significance to the insurance company in reinstating his policy.

As a fourth consideration in his test, Judge Watkins directs the court to examine the relationship between the undisclosed ailment(s) and the cause of death. In this case, a myocardial infarction was the direct cause of the insured's death. More generally, the insured's condition had been diagnosed several months prior to his death as severe coronary artery disease. In *Hofmann,* Judge Watkins observed that the cases have not uniformly required that the cause of death be the self-same undisclosed illness or condition. *Id.* at 831 & n. 6. While the symptoms and ailments in the present case cannot conclusively be described as the direct cause of death, they certainly were contributing factors. The signs of possible hypertension, diabetes, and chest pains, along with the overall physical condition and tension state of the insured described in the Pittsburgh Clinic report, even if not the groundwork of the later heart disease, most definitely reduced the ability

of the insured's body to withstand the onset of the terminal condition.

As a fifth factor, the Court must consider the present posture of the case. This case proceeded to trial and resulted in a jury verdict in favor of the plaintiff and is now before the Court on the defendant's motion for judgment N.O.V. The essential question at this point is: Should the jury have decided this case? The most important factor in deciding whether the issue should go to the jury is a conflict in testimony. *Hofmann, supra* at 834. The parties differ on the existence of a conflict. Plaintiff contends that Dr. Gantz' testimony directly conflicts with Dr. Henry's discussion on the materiality of the medical information. In opposition, the defendant argues that Dr. Gantz' remarks are irrelevant to a materiality inquiry for the purposes of deciding whether to accept, decline, or rate an insurance applicant. Defendant asserts that Dr. Gantz' testimony is relevant only as to use of the information in making a clinical diagnosis of hypertension, diabetes, or angina.

The Court agrees with the defendant that Dr. Gantz' testimony is irrelevant to the materiality inquiry. *See Peoples Life Insurance Co. v. Medairy*, 255 Md. 534, 548, 258 A.2d 429 (1969) (doctor who performed initial medical examination on applicant indicated lack of qualification to testify in regard to insurability question). The doctor's remarks do not rebut the fact that the symptoms outlined in his own records and those of the Pittsburgh Clinic were present in Mr. Fitzgerald in 1973. Furthermore, he does not contend that the several high blood pressure readings, the diabetic response to the test administered at the Pittsburgh Clinic, Mr. Fitzgerald's complaints of experiencing angina-like pain, and his own prescription of Rauzide, a high blood pressure medicine, for the insured did not occur in 1973, as indicated by the medical reports. In total, Dr. Gantz did not rebut the existence of the medical information identified as significant by Dr. Henry, but only the ability of Dr. Henry to use that information to support a clinical diagnosis of hypertension, heart disease, diabetes, or angina. Therefore, the Court concludes that the tes-

timony of Dr. Gantz does not conflict with that of Dr. Henry. Since there is no conflicting testimony with regard to the undisclosed visits and the information, test results, and findings that Dr. Henry has identified as significant from an insurance underwriter's point of view, there was no reason to submit the materiality issue to the jury. Thus, a motion for judgment N.O.V. provides a proper vehicle for the Court to remove from the jury an issue improperly submitted.

■ Furthermore, the Court believes that to find a conflict in the testimony in this case would set an unfair precedent in this area of the law. Such a holding would require submission of the materiality issue to the jury in any case, solely on the testimony of a medical doctor that the information in the treatment records did not support a clinical diagnosis of a certain ailment or disease. The Court does not believe that an insurer, making a predictive decision, should be held to a clinical standard of certainty. The Court reaches this decision fully cognizant of the requirement of the Maryland statute that "the insurer in *good faith* would either not have issued, reinstated . . . the policy or contract." Md. Ann.Code, art. 48A, § 374 (emphasis added). While the statute requires a close scrutiny of the insurer's retroactive decision, it does not demand, as the plaintiff has contended, that the question of good faith should be decided by the jury. In fact, Maryland law does not dictate that the materiality inquiry be restricted to the insurance company official's opinion and supporting reasons. *See Union Trust Co. v. Kansas City Life Ins. Co., supra* at 608. The Court, itself, can take judicial notice of the fact that certain information is "patently material" to the risk assumed. *Id.*

■ In summary, the Court finds that a misrepresentation occurred and that it was material to the risk assumed by the insurer as a matter of law. The undisclosed information revealed serious, although inconclusively diagnosed, ailments. It also showed extensive treatment by a local physician

and a journey of several hundred miles to a diagnostic clinic for further examination. Furthermore, the insignificance of the information disclosed in the reinstatement form contrasted sharply with the importance of the omitted information. Finally, the symptoms and indications of high blood pressure, diabetes, and chest pain complications reflected in the nondisclosed 1973 medical records were, at the least, factors contributing to the insured's death two years later. Based on an analysis of the evidence under the considerations set forth by Judge Watkins, then, this Court concludes that the undisclosed information was material to the risk as a matter of law. Therefore, the Court will enter an order, in accordance with the aforegoing opinion, granting the defendant's motion for judgment N.O.V.